**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Randall Mosser, Douglas Mosser, | ) | |
| Marilyn Koon, and Jayne Harkin, | ) | |
| | ) | **ORDER DENYING MOTIONS** |
| Plaintiffs, | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | |
| Denbury Resources, Inc. and | ) | |
| Denbury Onshore, LLC, | ) | Case No. 1:13-cv-148 |
| | ) | |
| Defendants. | ) | |

In this action, plaintiffs allege that defendants (collectively "Denbury") have tortiously and unlawfully invaded the subsurface of their property by using it as a permanent site for disposing of salt water generated from oil and gas drilling operations without their permission. In addition to seeking damages for the affront of the claimed trespass and for nuisance, plaintiffs also seek statutory compensation under North Dakota's surface owner protection law for the loss of the economic opportunity to lease their subsurface property to Denbury or others for the disposal of salt water and other oil field wastes or, possibly, the storage of natural gas or $CO_2$.

Denbury denies it has committed trespass. It contends the production of salt water is a necessary incident of oil and gas production and that it has the right to dispose of the salt water not only because it is an implied right of the dominant mineral estate but also because it has been authorized by a lease executed by plaintiffs' predecessors-in-interest. As for the claim of nuisance, Denbury contends that deep-earth disposal of salt water is a practical and environmentally-sound solution for disposing of this waste stream and, more importantly, it has been authorized and approved by the governing regulatory agency. Finally, Denbury contends that plaintiffs have no

1

right to monetary compensation because, according to it, the surface owner protection law does not extend to the subsurface disposal of salt water and that, in any event, plaintiffs have suffered no demonstrable damage.

Before the court is Denbury's motion for summary judgment of dismissal and plaintiffs' motion for partial summary judgment on the question of liability. Unless otherwise indicated, the facts relied upon by the court in resolving the motions are either undisputed or have not been sufficiently controverted.

I.    **BACKGROUND**

    A.    **Plaintiffs' interests as burdened by the Mosser Lease**

Plaintiffs are the owners of the surface estate only in the following described tract of land located in Billings County, North Dakota:

Township 141 North, Range 101 West
Section 26:  NW¼

When plaintiffs acquired their interest, it was already burdened by an oil and gas lease dated November 28, 1977 ("Mosser Lease") granted by plaintiffs' predecessors-in-title, who, at the time, owned both the surface and the minerals in the following property included in the Lease:

Township 141 North, Range 101 West
Section 17: All
Section 20: S½N½, SE¼
Section 21: S½
Section 22: S½
Section 25: All
Section 26: All
Section 27: All

(Doc. No. 64-2). The Mosser Lease remains in effect  because of continuous production of oil and gas from wells located on the leased acreage.

**B.** **The unitization of the lessee's rights in the Mosser Lease with other interests**

By Order No. 9410 dated May 16, 2003, the North Dakota Industrial Commission ("NDIC") authorized the creation of the T.R.-Madison Unit ("Unit") by approving a plan for unitization for the following lands in Billings County:

Township 141 North, Range 101 West
Section 10: All
Section 11: All
Section 12: All
Section 13: W½, NW¼NE¼
Section 14: All
Section 15: All
Section 16: All
Section 21: All
Section 22: All
Section 23: All
Section 24: NW¼NW¼
Section 25: W½
Section 26: All
Section 27: All

(Doc. No. 6-2, p. 9). Denbury is the current operator of the Unit.

**C.** **The Mosser Well**

Prior to the creation of the Unit, the Mosser Well was spud as an oil and gas well on what is now plaintiffs' surface acreage in the NW¼ of Section 26. It produced oil and gas from January 1979 through June 2006. (Doc. No. 64).

On March 12, 2008, the prior Unit operator, Encore Operating, L.P. ("Encore"), submitted an application the North Dakota Industrial Commission ("NDIC") to convert the Mosser Well into an injection well for the disposal of salt water. As part of the application, Encore submitted an affidavit certifying that it had notified the surface owners. Plaintiffs acknowledge that at least Doug Mosser received the notice. (Doc. No. 6-5, p. 16).

On April 11, 2008, the NDIC approved Encore's application to use the Mosser Well for the injection of salt water into the "Dakota Group," which is a formation that lies above the formation unitized by the NDIC's order creating the T.R.-Madison Unit. (Doc. No. 6-5). By administrative rule, the permit automatically expired if the conversion to a saltwater disposal well was not commenced within one year of its issuance. N.D.A.C. § 43-02-05-04(10). This same limitation was also reflected in the permit.

Encore did not begin the conversion within the one-year time period. However, on March 8, 2009, and prior to the permit expiring, Encore requested a one-year extension, which was approved by the NDIC on April 9, 2009. (Doc. No. 71-6). Later, on March 8, 2010, Encore requested a second extension, which was similarly approved by the NDIC on March 15, 2010. (Doc. No. 71-7).

On April 8, 2011, Denbury, which had now become the Unit Operator and owner of the Mosser Well, requested a third extension, which was approved by the NDIC on April 11, 2011. (Doc. No. 71-8). Following this extension and almost three and one half years after the application for conversion of the well was first submitted by Encore, Denbury completed the conversion of the well for saltwater disposal on September 26, 2011, and the first saltwater injection took place on September 30, 2011. (Doc. No. 6-7).

Other than the first notice that went out to one or more plaintiffs when Encore made its initial application to convert the Mosser Well for saltwater disposal in March 2008, the record is devoid of any notice being given of the NDIC's approval of that request, much less any of the three follow-on requests for extensions and NDIC approvals. As will be addressed in more detail later, Denbury argues that the notice given to one or more plaintiffs in March 2008 was sufficient to put plaintiffs

on notice that they needed to be diligent about protecting their rights, but the court is skeptical of that given the permit automatically expired if the conversion was not commenced in one year, the lack of any follow-on notice of extensions being applied for and granted, and the long period of inaction.

## II.    DISCUSSION

### A.    Introduction

Plaintiffs claim they are entitled to damages under three separate claims for relief: trespass; nuisance; and a statutory claim for damages pursuant to N.D.C.C. ch. 38-11.1.  They ask in their motion for partial summary judgment that the court adjudge Denbury liable, contending liability is clear and that the only question for trial is the amount of damages.

Denbury, on the other hand, contends it has the right to dispose of salt water in the subsurface of plaintiffs' property without having to provide compensation.  Consequently, it seeks summary judgment of dismissal.

For ease of discussion, the court will address the competing motions in the context of plaintiffs' individual claims for relief.

### B.    Trespass and nuisance claims

#### 1.    Denbury's claim of rights under the Mosser Lease

Denbury makes several arguments for why plaintiffs have no claim for trespass or nuisance. The one that has percolated to the forefront with the supplemental briefing is its argument that by executing the Mosser Lease, plaintiffs' predecessors-in-interest expressly granted the right to use the subsurface of plaintiffs' property for the disposal of salt water.  The language of the Lease that Denbury relies upon is found in the "granting clause" and reads, in relevant part, as follows:

That the lessor . . . has granted, demised, leased and let and by these presents does grant, demise, lease and let exclusively unto said lessee, with the exclusive right of mining, exploring by geophysical and other methods and operating for and producing therefrom oil and all gas of whatsoever nature or kind, and laying pipe lines, telephone and telegraph lines, housing and boarding employees, building tanks, power stations, gasoline plants, ponds, roadways, and structures thereon to produce, save, market and take care of said products and *the exclusive surface and subsurface rights and privileges related in any manner to any and all such operations and any and all other rights and privileges necessary, incident to, or convenient for the economical operation alone or conjointly with neighboring land for such purposes,* [the lands described above].

(Doc. No. 64-2) (emphasis added).

Before turning to the lease language, the court notes that plaintiffs have failed to rebut the evidence proffered by Denbury that their predecessors-in-interest granted the Mosser Lease, that it is still in effect, and that they are bound by it. Also, it is clear that Denbury, as the Unit Operator, has succeeded to and may exercise the rights of the lessee under the Mosser Lease for the benefit of the Unit's operations generally, and not just those actions occurring on the Lease premises, given the unitization provisions of the Mosser Lease and the Unit Agreement and Plan.[1] But, even without

---

[1] See, e.g., Kysar v. Amoco Production Co., 93 P.3d 1272, 1280-82 (N.M. 2004). The unitization provisions of the Mosser Lease read in part:

5.   * * * * In addition to the foregoing, lessee shall have the right to unitize, pool, or combine all or any part of the above described lands as to one or more of the formations thereunder with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement and, in such event, the terms, conditions, and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation and, particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement, and this lease shall not terminate or expire during the life of such plan or agreement.

(Doc. No. 64-2).

The Unit Agreement and Plan of Unitization for the T.R.-Madison Unit provides in pertinent part:

10.   RIGHTS AND OBLIGATIONS OF THE UNIT OPERATOR.  Except as otherwise specifically provided herein, the exclusive right, privilege, and duty of exercising any and all rights of the parties hereto, including surface rights, which are necessary or convenient for prospecting for, producing, storing, allocating, and distributing the Unitized Substances are hereby delegated to and shall be exercised by the Unit Operator as herein provided.  * * * *

(Doc. No. 64-11, pp. 6-7).

the express language of the Mosser Lease, the result would be the same with respect to the implied rights under the Lease given the provisions of North Dakota's unitization statutes as implemented by the NDIC-approved Unit Plan. See N.D.C.C. §§ 38-08-9.4 & 38-08-09.8; cf. Continental Resources, Inc. v. Farrar Oil Co., 1997 ND 31, ¶¶ 12-17, 559 N.W.2d 841; see generally 5 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 78.4[a] (Matthew Bender, Rev. Ed.); 2 Bruce M. Kramer and Patrick H. Martin, The Law of Pooling and Unitization, § 20.06 (3d ed. LexisNexis Matthew Bender 2014).[2]

Also, before addressing the language of the Mosser Lease, it is helpful to consider the North Dakota Supreme Court's decision in Feland v. Placid Oil Co., 171 N.W.2d 829 (N.D. 1969). In Feland, the North Dakota Supreme Court discussed whether the lessee of an oil and gas lease, which was binding upon the surface owner, had the right to construct a second saltwater disposal pit under lease language that granted the lessee the right to use the surface estate for the purposes of:

> 'operating for and producing therefrom oil, gas, casinghead gas, casinghead gasoline, and laying pipelines, telephone and telegraph lines, and building tanks, powers, stations, gasoline plants, ponds, roadways and structures thereon to produce, save and take care of said products, and the exclusive right of injecting water, brine and other fluids into subsurface strata, and housing and boarding employees and *any and all other rights and privileges necessary, incident to, or convenient for the economical operation alone, or conjointly with neighboring land, for the production, saving, and taking care of oil*, gas, casinghead gas, casinghead gasoline and the injection of water, brine and other fluids into subsurface strata, * * *'

---

[2] Before Denbury relied upon the express or implied rights of the Mosser Lease for its argument that it has the right to use plaintiffs' subsurface for the disposal of salt water, plaintiffs contended that the rights acquired by Denbury did not extend to it being able to use the formation into which the salt water is being injected because the only thing that was unitized by the NDIC's order approving the Unit Agreement and Plan is the formation from which oil and gas is being recovered. In support, plaintiffs cited to the North Dakota Supreme Court's decision in Buchholz v. Burlington Resources Oil and Gas Co. LP, 2008 ND 173, 755 N.W.2d 914 ("Buchholz"). It is not clear whether plaintiffs are still contending this argument has any validity, given the express or implied rights granted by the Mosser Lease, but, even if they are, the argument has no merit since the rights granted by the Mosser Lease extend to the use of the surface estate generally. And here, it is plaintiffs who are arguing that the subsurface pore space should be treated the same as the rest of the surface estate.

Id. at 832 (the language from the lease as set forth in the opinion with italics added).

Before the North Dakota Supreme Court addressed the significance of this lease language, it discussed the fact that the granting of an oil and gas lease will give rise to an implied right to use the surface of the leased land as reasonably necessary for the production of oil and gas, quoting Summers Oil and Gas as follows:

> "An oil and gas lease carries with it the right to possession of the surface to the extent reasonably necessary to enable the lessee to perform the obligations imposed upon him by the lease. (Citations omitted.) 'This rule is based upon the principle that when a thing is granted all the means to obtain it and all the fruits and effects of it are also granted.' (Citations omitted.) Accordingly, the right to such use of the surface is implied if it is not granted, whether the form of conveyance is a mineral deed or a lease." (Citations omitted.) 4 Summers, Oil & Gas, Sec. 652, page 2.

Id. at 833-34. The court then concluded, however, that the lessee's right to use the surface for a second disposal pit in Feland was based upon the rights expressly granted by the lease and not the lessee's implied rights. The court pointed to the catchall language set forth in italics above, stating:

> Of course, in the instant case, the rights of the operator to use the land are not based on implied rights but rather on the rights expressly granted by the lease. The lease expressly designates the lessee's surface rights, including the broad authorization to "all other rights and privileges necessary, incident to, or convenient" for economical operation and production of oil.

Id. at 834.[3]

While the Mosser Lease does not specifically mention the disposal of salt water or brine as did the lease in Feland, it does make reference to "subsurface rights and privileges" and does have essentially the same broad catchall language that the North Dakota Supreme Court relied upon in Feland. Also, at the time the Mosser Lease was consummated, disposal of the salt water by injection

_____

[3] The reason why the court may have focused upon the catchall language was because the remainder of the operative language, although granting the right to use the subsurface for disposal of brine (i.e., salt water), did not specifically mention the use of surface pits for dealing with this waste substance.

deep into the earth was an accepted method of salt water disposal. See, e.g., West Edmond Salt Water Disposal Ass'n v. Rosecrans, 226 P.2d 955, 969 (Okla. 1950);[4] cf. Feland, 171 N.W.2d at 832 (lease in that case explicitly permitted injection of brine into the subsurface). Consequently, given the breadth of the lease language and the fact that the generation of salt water is a necessary "incident" of oil and gas production, the court agrees with Denbury that the express language of the Mosser Lease conveys the right to use the leased property for subsurface disposal of salt water. But, even if the court is wrong about this point, using the subsurface for disposal of salt water would be an *implied* right under the lease given it is a necessary consequence of oil and gas production and the need to dispose of it. See Dick Properties, LLC v. Paul H. Bowman Trust, 221 P.3d 618, 621 (Kan. Ct. App. 2010) ("Dick Properties, LLC"); Leger v. Petroleum Engineers, Inc., 499 So.2d 953, 955-56 (La. Ct. App. 3d Cir. 1986); cf. Feland, 171 N.W.2d at 833-34 (discussing the implied rights of an oil and gas lessee as set forth above).[5]

---

[4] In Rosencrans, the Oklahoma Supreme Court referenced with apparent approval a brief filed by the Oklahoma Attorney General addressing the subject of disposal of salt water into the subsurface by injection. The court stated:

> The Attorney General of the State has filed a brief amicus curiae on behalf of the State, calling attention to the large production of salt water as a necessary incident to the production of oil and gas; the detriment to the State and its citizens occasioned by permitting this salt water to get into the streams, lakes or fresh water strata in the State; the fact that underground disposal in salt water bearing formations is rapidly becoming a common practice in oil producing states, and is the most logical and sensible solution of the problem of salt water disposal, and stating that if such disposal of salt water is forbidden unless oil producers first obtain the consent of all persons under whose lands it may migrate or percolate, underground disposal would be practically prohibited.

226 P.2d at 969.

[5] In reaching the conclusion that Denbury can take advantage of either an express or implied right under the Mosser Lease to use plaintiffs' pore space for the disposal of salt water, the court rejects plaintiffs' argument that *permanent* disposal of salt water on the leased lands falls outside the scope of the lease because, according to plaintiffs, it is ancillary to the exploration, production, and transportation of oil and gas. While there is some support for this argument, see, e.g., Makar Production Co. v. Anderson, No. 07-99-0050-CV, 1999 WL 1260015, at **2-3 (Tex. Ct. App. Dec. 15, 1999) (unpublished opinion), the court concludes that the North Dakota Supreme Court would decide to the contrary based on the reasons and authority set forth above. Further, as discussed in a later footnote, this court decided in Fisher v. Continental Resources, Inc., 49 F. Supp. 3d 637 (D.N.D. 2014) that the unit operator in that case could exercise the implied rights of the mineral owners arising out of the dominance of the mineral estate to use the surface estate for the permanent disposal of salt water, subject to the accommodation doctrine possibly requiring a different

(continued...)

Plaintiffs contend that, notwithstanding what rights may be granted by the Mosser Lease, the exercise of those rights is still subject to a balancing of interests under the "accommodation doctrine" as adopted by the North Dakota Supreme Court in Hunt Oil Co. v. Kerbaugh, 283 N.W.2d 131 (N.D. 1979) ("Kerbaugh"), and that Denbury has other alternatives for disposing of the salt water that could have been exercised rather than using their subsurface as a permanent dumping ground for the waste. Plaintiffs contend the question of whether Denbury should have exercised one of these other alternatives is one of fact that prevents the granting of summary judgment with respect to its claims for trespass and nuisance.

Denbury disagrees, arguing that the accommodation doctrine set forth in Kerbaugh applies only when the rights being exercised are those of a severed mineral owner (or lessee thereof) and there is no contract or other instrument that has been executed by, or is otherwise binding upon, the surface owner. Denbury contends that, in this case, the lease language granting the right to use the surface estate for the purposes specified when it is "convenient" for lessee's operations gives the lessee the sole right to determine whether an authorized use should be employed and necessarily forecloses any balancing. For support, Denbury relies upon the following passage in Feland, where North Dakota Supreme Court stated:

> In the instant case the operator's rights were made clear by the broad authorization in the express terms of the lease. These rights were not abrogated by lessors' refusal to grant permission for construction of salt water disposal pits. Operator's rights as lessee were not dependent on lessors' granting or not granting permission. Lessors' refusal was of no legal significance in regard to this first issue.

---

[5](...continued)
result, and, here, there is no reason why the implied rights of the lessee would be any less. All of this being said, one wonders whether Denbury would be trumpeting the express provisions of the Mosser Lease if, for example, it required the lessee, or any persons taking advantage of the lessee's rights, to pay a per-barrel fee for the disposal of salt water on the leased premises. Cf. Buchholz v. Burlington Resources Oil and Gas Co. LP, 2008 ND 173, ¶¶ 18-20, 755 N.W.2d 914.

171 N.W.2d at 834. Denbury also cites to cases from other jurisdictions which have held that the accommodation doctrine applies only when the mineral developer's rights are based upon the dominance of the mineral estate, *i.e.*, not upon an agreement or instrument binding upon the surface owner, and that the term "convenient" in such a lease or other instrument gives the mineral developer essentially unfettered discretion in employing a use of the surface estate authorized by the contract or other instrument. The two cases that Denbury primarily relies upon are <u>Zeiler Farms, Inc. v. Anadarko E & P Co., LP</u>, No. 07-cv-01985, 2009 WL 890716, at \*\*3-5 (D. Colo Mar. 31, 2009) <u>supplemented by</u> 2010 WL 2681724, at \*\*3-5 (July 1, 2010) and <u>Landreth v. Melendez</u>, 948 S.W.2d 76, 80-82 (Tex. Ct. App. 1997).

In addressing these arguments, it is necessary to begin with the North Dakota Supreme Court's decision in <u>Kerbaugh</u> where it adopted the accommodation doctrine. In <u>Kerbaugh</u>, the dispute was between the surface owner and an assignee of a severed mineral owner's lessee. Consequently, the court did not address what regard a mineral developer would have to give to the surface owner's use of the surface estate when the rights of the mineral developer are the subject of an agreement or instrument binding upon the surface owner. In fact, the North Dakota Supreme Court's discussion of the rights acquired by a mineral developer simply by virtue of the dominance of the mineral estate suggests that the language of an express agreement or instrument may trump. In particular, the court stated:

> The above cases recognize the well-settled rule that where the mineral estate is severed from the surface estate, the mineral estate is dominant. <u>See</u> Annot., 53 A.L.R.3d 16; 4 Summers, <u>Oil and Gas</u>, s 652; 58 C.J.S. <u>Mines and Minerals</u> s 159b. The mineral estate is dominant in that the law implies, where it is not granted, a legitimate area within which mineral ownership of necessity carries with it inherent surface rights to find and develop the minerals, which rights must and do involve the surface estate. Without such rights the mineral estate would be meaningless and

worthless. Thus, the surface estate is servient in the sense it is charged with the servitude for those essential rights of the mineral estate.

> *In the absence of other rights expressly granted or reserved*, the rights of the owner of the mineral estate are limited to so much of the surface and such use thereof as are Reasonably [sic] necessary to explore, develop, and transport the minerals. See, Union Producing Co. v. Pittman, 245 Miss. 427, 146 So.2d 553 (1962); 58 C.J.S. Mines and Minerals s 159c; Annot., 53 A.L.R.3d 16 s 3(a). In addition to, or underlying the question of what constitutes reasonable use of the surface in the development of oil and gas rights, is the concept that the owner of the mineral estate must have Due regard for the rights of the surface owner and is required to exercise that degree of care and use which is a just consideration for the rights of the surface owner. Getty Oil Co. v. Jones, 470 S.W.2d 618, 621, 53 A.L.R.3d 1 (Tex. 1971). Union Producing Co. v. Pittman, supra; 58 C.J.S. Mines and Minerals s 159c; Annot., 59 A.L.R.3d 16 s 3(c). Therefore, the mineral estate owner has no right to use more of, or do more to, the surface estate than is reasonably necessary to explore, develop, and transport the minerals. Union Producing Co. v. Pittman, supra; 58 C.J.S. Mines and Minerals s 159c. Nor does the mineral estate owner have the right to negligently or wantonly use the surface owner's estate. See, Union Producing Co. v. Pittman, supra; 4 Summers, Oil and Gas, s 652.

Kerbaugh, 283 N.W.2d at 135-36 (footnote omitted) (italics added).

Since Kerbaugh, the North Dakota Supreme Court has not had occasion to address what obligations a mineral developer would have in terms of giving due regard to a surface owner's existing use of the surface estate when there is a lease or other agreement binding upon the surface owner, much less one that permits the uses specified in the lease or other agreement to be employed when it is "convenient" for the lessee. While the North Dakota Supreme Court might conclude that Feland (which was decided before the adoption of the accommodation doctrine in Kerbaugh) is dispositive and no balancing is required as Denbury contends, this result is not inevitable for several reasons.

First, it does not appear the surface owner in Feland contended that an existing surface use was unduly burdened and presented evidence that the mineral developer had another reasonable alternative. Rather, the court's discussion about the mineral developer's right under the lease to

construct a second pit was in the context of an outright refusal of the surface owner to permit a second pit.[6]

Second, and perhaps more significantly, it is not out of the realm of possibility that the North Dakota Supreme Court could conclude that the use of the word "convenient" is not enough to trump the limits that otherwise would exist upon the right of the mineral developer to use the surface estate and that more clear language would be required. See Bruce M. Kramer, The Legal Framework for Analyzing Multiple Surface Use Issues, RMMLF (Feb. 17-18, 2005) (suggesting that the phrase "all usual, necessary and convenient means" does not necessarily foreclose applying the "multi-dimensional approach" [*i.e.*, balancing of interests] of the accommodation doctrine); cf. Greeley-Rothe LLC v. Anadarko E & P Co. LP, No. 08-cv-00401, 2010 WL 1380365, at ** 5-7 (D. Colo. Mar. 31, 2010). There may be other possibilities as well, such as the conclusion that the stock phrase "necessary, incident to, or convenient" creates only the nominal right to use the surface subject to any balancing that may be required under the accommodation doctrine.[7]

---

[6] In fact, the court's discussion about the extent of the mineral developer's lease rights in Feland was arguably dicta. This is because the ultimate issue in Feland was whether the oil and gas lease had expired as a result of the well being shut-in for a period of nine months because the initial saltwater disposal pit was full. With respect to that issue, the court concluded the lease had not expired because the mineral developer had acted reasonably in not constructing a second pit. This conclusion likely could have been reached without first deciding what rights the mineral developer had to construct the second pit, particularly since the surface owner refused to allow it.

[7] To help put a finer point upon the discussion, it may be helpful to consider the differences in a slightly different fact scenario. For example, an oil and gas lease granted by a surface owner's predecessor-in-interest may expressly authorize the use of the surface estate for installation of an electric power line when "necessary, incident to, or convenient" for the lessee's operations, as it appears the Mosser Lease does in this case. In such an instance, following the logic of Denbury' argument, the surface owner would be limited to challenging such use of the surface estate when it is excessive or negligent and any balancing of interests to accommodate uses being made of the property by the lessor need not take place. In other words, the lessee would have the exclusive right to decide whether a power line should be used as opposed to some other alternative, such as an on-site generator. The same would be true for the route of the line across the leased property with the surface owner being powerless to insist that the lessee use a longer and slightly more expensive route, even when it would substantially lessen the impact upon the surface owner's use of the property, such as avoiding interference with an existing center-pivot irrigation system.

The court is not convinced that the North Dakota Supreme Court would agree that the "necessary, incident to, or convenient" language necessarily precludes a balancing of rights, particularly with respect to the manner in which

(continued...)

In this case, the court need not decide what the North Dakota Supreme Court would conclude about whether the use of the word "convenient" in the Mosser Lease necessarily forecloses a balancing of interests comparable to what it concluded in Kerbaugh may sometimes be required. This is because plaintiffs have failed to make the required threshold showing for any balancing of rights.

The prevailing view of the jurisdictions that have adopted the accommodation doctrine is that it requires due regard be given only to existing uses of the surface estate by the surface owner and, perhaps, future uses that are imminent, such as where a substantial step or investment has been made by the surface owner. See, e.g., Amoco Production Co. v. Thunderhead Investments, Inc., 235 F. Supp. 2d 1163, 1172-73 (D. Colo. 2002); Merriman v. XTO Energy, Inc., 407 S.W.3d 244, 249 (Tex. 2013); see generally 4 Summers Oil and Gas § 40:2 (3d ed. database last updated Nov. 2014); Patrick H. Martin and Bruce M. Kramer, 1-2 Williams & Meyers, Oil and Gas Law § 218.8 (LexisNexis Matthew Bender 2014) ("Williams & Meyers"). While it does not appear that the North Dakota Supreme Court has explicitly addressed this point, it is likely to reach the same conclusion, given the tenor of its discussion of the accommodation doctrine in Kerbaugh, the authority it relied upon, and the underlying rationale for why due regard must be given to the surface owner's interests in some, but not all, situations. See Kerbaugh, 283 N.W.2d at 136-38.

In this case, plaintiffs have proffered no evidence of their having used the subsurface formation into which Denbury is currently injecting salt water for any purpose or that they were on

---

[7](...continued)
a specified use might be carried out, such as with the route of the power line under the foregoing hypothetical. That being said, the number of situations where potential conflicts of this kind cannot be resolved may now be less given that the mineral owner must pay damages for use of the surface estate under North Dakota's surface owner protection law. This provides some incentive to accommodate existing uses when the costs to the mineral developer in damages and potentially attorney fees may be greater than what might be saved by not providing accommodation.

the verge of doing so. Hence, even if in other situations there may have to be a balancing of interests notwithstanding the use of the word "convenient" in an oil and gas lease binding the surface owner, this is not one of them.[8]

### 2. Fact issues remain that preclude the granting of summary judgment with respect to plaintiffs' claims of trespass and nuisance

Given the foregoing, plaintiffs' claims of trespass and nuisance fail save in one possible respect. The express or implied rights that Denbury has succeeded to do not authorize it to dispose of salt water generated from outside the Unit. Cf., e.g., Hill v. Southwestern Energy Co., No. 4:12-cv-500, 2013 WL 5423847, at **3-4 (E.D. Ark. Sept. 26, 2013) (lease did not grant right to use the property for storage of frack waste fluid from any possible source); Dick Properties, LLC, 221 P.3d

---

[8] The conclusion reached here is not contrary to what District Judge Hovland has decided so far in Fisher v. Continental Resources, Inc., 49 F. Supp. 3d 637 (D.N.D. 2014), which is still pending. In Fisher, the court concluded that: (1) the unit operator in that case succeeded to the implied rights of the owners of the oil and gas underlying the Fishers' surface estate by virtue of North Dakota's unitization statutes as given effect by an NDIC-approved unit agreement; and (2) the implied rights, arising by virtue of the dominance of the mineral estate, included the right to locate a saltwater disposal well on the Fishers' surface estate and use that well to dispose of salt water generated from any place within the unit, but only if the use of the Fishers' surface estate for that purpose was reasonably necessary within the meaning of the accommodation doctrine as adopted by the North Dakota Supreme Court in Kerbaugh. With respect to that issue and the other questions relevant to claims of trespass and nuisance similar to the ones alleged in this case, the court concluded there were fact questions that precluded the granting of summary judgment. The court stated:

> The record reveals the Unit consists of approximately 50,000 acres. It is arguably debatable whether it was reasonably necessary to use the Subject Property, as opposed to some other tract within the Unit, for salt water disposal operations. The salt water produced by Continental's Unit operations could be taken elsewhere by truck or pipeline, recycled, or used for enhanced recovery operations. Whether such alternatives are reasonable remains an issue to be resolved by the fact finder. In addition, questions of fact remain as to whether the Lonesome Dove 42-17 SWD well has been put into use, and whether it has or will receive waste water from outside the Unit. It will be necessary for the Fisher's [sic] to demonstrate at trial that reasonable alternatives are available and the construction and use of the Lonesome Dove 42-17 SWD well was not reasonably necessary. It is clear there are a number of genuine issues of material fact which remain disputed and/or unknown. Thus, summary judgment on the Fisher's claims for trespass and nuisance are not warranted at this stage.

49 F. Supp. 3d at 647.

Fisher is different from this case in several respects. In Fisher, there was no evidence that the surface owners had entered into or were bound by a lease or other instrument that conveyed rights with respect to the use of the surface estate for the production of oil and gas. Further, in Fisher, there was no pre-existing well that had been used for oil and gas recovery and converted for use as a saltwater disposal well. In Fisher, the unit operator had entered the Fishers' property and drilled a well specifically for the disposal of salt water without first coming to terms with them. Hence, unlike this case where the only issue presented by plaintiffs is Denbury's use of the subsurface, Fisher involves the reasonable necessity of the mineral developer's use of both the surface and the subsurface of the Fishers' property.

at 621 (lessee's court-implied covenant to dispose of salt water is limited to salt water produced on the lease); Kysar v. Amoco Production Co., 93 P.3d 1272, 1278, 1283-86 (N.M. 2004) (no right of the unit operator to use the surface of leased lands lying outside the unit absent an agreement to the contrary).[9] And, whether or not that has occurred remains a proper subject for discovery. For this reason, plaintiffs' claims of trespass and nuisance will not now be dismissed.

## C.     Statutory claim for damages pursuant to N.D.C.C. ch. 38-11.1

### 1.     Introduction

N.D.C.C. ch. 38-11.1 was enacted by the North Dakota Legislature in 1979 to ameliorate what was perceived to be inequities resulting from application of the common law doctrine that the mineral estate is dominant and permits cost-free use of the surface estate as is reasonably necessary for the development of the minerals. See Murphy v. Amoco Production Co., 729 F.2d 552 (8th Cir. 1984); Kartch v. EOG Resources, Inc., No. 4:10-cv-014, 2010 WL 4260103, at *2 (D.N.D. Oct. 22, 2010). Included within the chapter are various provisions that require the mineral developer to pay compensation for the use of the surface estate and any damage to it, regardless of whether the mineral estate is separated from the surface estate and regardless of who executed the document that gave the mineral developer the right to develop the mineral estate. See id.

In this case, plaintiffs seek monetary compensation for Denbury's use of the pore space underlying the surface of their land for the injection of salt water. Plaintiffs point to N.D.C.C. § 38-

---

[9] The Mosser Lease contains a provision that extends the lessee's rights to use the leased property for the uses specified to support operations on "neighboring lands." Whether Denbury, in its capacity as the Unit Operator, can take advantage of that provision to dispose of salt water generated from outside the Unit but on neighboring lands, if there are any, is an issue the court need not decide now. Also, Denbury may argue that its permit from the NDIC for the disposal of salt water insulates it from any claim of trespass or nuisance, at least so long as it is not in violation of the terms of the permit. Again, the court need not decide this point now but it is skeptical that whatever police powers have been granted to the NDIC would go so far as to authorize the burdening of plaintiffs' land with the disposal of salt water generated from outside the Unit, much less that the NDIC has actually exercised any such power in this instance through the permit that was granted.

11.1-04, which requires that mineral developers compensate surface owners for the use of and damage to the surface estate - even when it is reasonably necessary for the development of the mineral interests. Denbury makes several arguments for why plaintiffs are not entitled to compensation pursuant to § 38-11.1-04. However, before addressing these arguments, it is helpful first to discuss the ownership of the subsurface pore space under North Dakota law.

## 2. Ownership of subsurface pore space

In North Dakota, it is clear that the surface owner owns the subsurface pore space given that N.D.C.C. § 47-01-12 (which dates back to at least the 1877 Civil Code for the Dakota Territory) provides:

> **§ 47-01-12.  Scope of ownership – Above and below the surface.**
> The owner of land in fee has the right to the surface and to *everything* permanently situated beneath or above it.

(italics added). See also Burlington Resources Oil & Gas Co., LP, v. Lang and Sons Incorporated, a/k/a Lang and Sons, Inc., 2011 MT 199, ¶¶ 23-24, 259 P.3d 766 ("Burlington Resources") (construing an almost identical statute to include pore space).[10]

More recently, the North Dakota Legislature in 2009 adopted N.D.C.C. ch. 47-31 to address subsurface pore space. While N.D.C.C. § 47-31-03 provides that "[t]itle to pore space in all strata underlying the surface of lands and waters is vested in the owner of the overlying surface estate[,]" this appears to do nothing more than put a finer point on what already has been the long-established

---

[10]  Even in the absence of a governing statute, the prevailing view in most jurisdictions appears to be that the subsurface pore space belongs to the surface owner.  See, e.g., Ellis v. Arkansas Louisiana Gas Co., 450 F. Supp. 412, 420 (E.D. Okla. 1978);  Emeny v. United States, 412 F.2d 1319, 1031-32 (Ct. Cl. 1969) (applying Texas law); Cassinos v. Union Oil Co. of California, 14 Cal. App. 4th 1770, 1782-83 (Cal. Ct. App. 2d Dist. 1993); Humble Oil & Refining Co. v. West, 508 S.W.2d 812, 815 (Tex. 1974); cf. Dick Properties, LLC, 221 P.3d at 620-22; see generally 1-2 Williams & Meyers at § 218; Owen L. Anderson, Kay Bailey Hutchison, & R. Lee Gresham, Legal and Commercial Models for Pore-space Access and Use for Geologic Co2 Sequestration, 2015 NO. 4 RMMLF-INST PAPER NO. 9 at ** 9-7 - 9-12 & n.48 (May 2015).

law in North Dakota. Of more significance, and probably the reason for the enactment of ch. 47-31, are the provisions that prohibit severance of the pore space from the surface estate along with the provision making clear that a lease of the pore space is not a prohibited severance. See N.D.C.C. §§ 47-31-04 to 47-31-06.[11]

Not surprisingly, Denbury does not appear to contest that the surface owner owns the pore space in North Dakota.

### 3. Denbury's argument that plaintiffs' complaint fails to state a claim for damages pursuant to ch. 38-11.1

Denbury argues that plaintiffs' statutory claim for damages pursuant to ch. 38-11.1 should be dismissed because plaintiffs failed to set forth a claim under this chapter in their complaint. While the complaint could have been more clearly written, the court concludes plaintiffs have pled just enough to state a claim pursuant to ch. 38-11.1 for the reasons articulated by this court in Fisher, where the court rejected the same argument with respect to a similarly-worded complaint, which, notably, was prepared by the same attorneys who are representing plaintiffs in this case. Fisher, 49 F. Supp. 3d at 648.[12]

---

[11] Section 47-31-08 makes clear that nothing in the chapter was intended to change the relationship of the severed mineral owner to the owner of the pore space in terms of the dominance of the mineral estate. This was likely inserted to reinforce what already was the law in North Dakota.

[12] Even if the complaint did not state such a claim, it would not be too late for plaintiffs to move to amend the complaint to include the claim given the current posture of the case and the fact that Denbury would not be prejudiced.

**4.** **Denbury's argument that any right to statutory damages pursuant to ch. 38-11.1 does not extend to the use of subsurface pore space**

**a.** **Denbury's argument based on the use of the word "land" in § 38-11.1-04**

Denbury argues that the right of the surface owner to damages under ch. 38-11.1 does not extend to a mineral developer's use of the pore space. In support, Denbury focuses primarily upon the use of the word "land" in § 38-11.1-04, which is the section both parties agree provides the operative language in terms of whether or not the chapter provides compensation for a mineral developer's use of the pore space. In relevant part, § 38-11.1-04 reads:

**§ 38-11.1-04. Damage and disruption payments.**
The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner and the surface owner's tenant, if any, for lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations. The amount of damages may be determined by any formula mutually agreeable between the surface owner and the mineral developer. When determining damage and disruption payments, consideration must be given to the period of time during which the loss occurs and the surface owner must be compensated for harm caused by exploration only by a single sum payment. * * * *

Denbury argues that, while the term "land" is not defined in ch. 38-11.1, it is defined in N.D.C.C. § 47-01-04, which reads as follows:

**§ 47-01-04. Land defined.**
Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance.

Denbury contends that, absent some indication to the contrary, the North Dakota Legislature must have intended that the term "land" as used in § 38-11.1-04 would have the meaning as that set forth in § 47-01-04 and that this definition necessarily excludes pore space.

The court is not convinced. Even if the state legislature intended that "land" as used in § 38-11.1-04 should have the same meaning as in § 47-01-04, "solid material of the earth" is clearly a

relative description in that all soil and gravel, as well as many rock formations, have some interstitial space, and there is no reason to believe that the reference to soil, rock, or other substance in § 47-01-04 was meant to exclude the space encapsulated within that material. Also, in focusing upon the definition contained § 47-01-04, Denbury ignores the other section from that same chapter set forth earlier, *i.e.*, § 47-01-12, which states the "owner of *land* in fee has the right to the surface and to *everything* permanently situated beneath or above it." (italics added). In other words, even if the use of the word "land" in § 38-11.1-04 was intended to be the definition set forth in § 47-01-04, there would be no reason to believe that the use of that term in ch. 38-11.1 would not carry with it the rights that extend to the person owning the land as set forth in § 47-01-12.

The court doubts, however, that the state legislature had in mind the particular definition of "land" set forth in § 47-01-04 when it is used the term in § 38-11.1-04, which is in a different title of the North Dakota Century Code. The word "land" can have different meanings depending upon the context in which it is used. A very common usage is that it is another term for a person's property or estate. See, e.g., Webster's New World Dictionary, Third College Edition 758 (1988) ("**5** a) ground considered as property; estate *[to invest in land]*, b) [pl.] specific holdings in land"); Webster's Third New International Unabridged Dictionary 1268 (1965) ("**[4] b** *law*: any ground, soil, or earth whatsoever regarded as the subject of ownership (as meadows, pastures, woods) and everything annexed to it whether by nature (as trees, water) or by man (as buildings, fences) extending indefinitely vertically upwards and downwards **c**: an interest or estate in land: *broadly*: TENEMENT, HEREDITAMENT – compare REAL ESTATE); Black's Law Dictionary 892-93 (8th ed. 2004) (**1.** An immovable and indestructible three-dimensional area consisting of a portion of the earth's surface, the space above and below the surface, and everything growing on or permanently

affixed to it.  **2.**  An estate or interest in real property.).[13]  And here, the context in which the word "land" is used in § 38-11.1-04 is consistent with this common usage.

In particular, "lost land value" as used in § 38-11.1-04 usually connotes a loss of value of a person's entire interest in the property.  Further, the fact that "land" likely was intended to mean essentially "property" is further reinforced by what the state legislature stated in the first section of the chapter with respect to its legislative findings:

> 3.     Owners of the surface estate and other persons should be justly compensated for injury to their persons and *property* and interference with the use of their *property* occasioned by oil and gas development.

N.D.C.C. § 38-11.1-01(3) (italics added).  Not surprisingly, the Montana Supreme Court appears to have ascribed the same meaning to the term "land" when, in construing comparable language under Montana's surface owner protection law, it suggested a mineral developer would be required to pay compensation for use of subsurface pore space if the surface owner could prove compensable damages.  <u>Burlington Resources</u>, 2011 MT 199, at ¶ 31 ("We recognize that the provision authorizing compensation for 'lost land value' under § 82-10-504(1)(a), MCA, could encompass damage sustained by a surface estate owner for the use of pore space.").[14]

Finally, the statute's use of "surface owner" and the definition of "surface owner" does not suggest that the intent of the legislature was only to compensate for damages to the surface of the surface estate, as Denbury suggests.  The term "surface owner" is commonly used to distinguish the

---

[13]  In fact, the Unit Agreement for the T.R.-Madison Unit repeatedly uses the word "land" in this sense.  (Doc. No. 64-11).

[14]  Like North Dakota's law, Montana's surface owner protection law uses the terms "land" and "property" interchangeably.  <u>See</u>, <u>e.g.</u>, MCA § 82-10-501(2)(c) ("owners of the surface estate should be justly compensated for use of their property and interference with the use of their property due to oil and gas development"), MCA § 82-10-504 (1)(a) ("The oil and gas developer or operator shall pay the surface owner a sum of money or other compensation equal to the amount of damages sustained by the surface owner for loss of agricultural production and income, lost land value, and lost value of improvements caused by oil and gas operations.").

owner of the surface estate (together with all of the rights of the surface owner) from the owner of the mineral estate or the rights of a mineral lessee. Further, in making this argument, Denbury ignores the references to "surface estate" in ch. 38-11.1, including the legislative finding set forth above and the definition of that term in N.D.C.C. § 38-11.1-03(6).[15]

### b. What the North Dakota Supreme Court is likely to conclude with respect to pore space being included within the scope of ch. 38-11.1

The court's sole task here is to make a judgment with respect to how the North Dakota Supreme Court is likely to decide whether pore space is included within the term "surface owner's land," such that a surface owner may be entitled to damages if the surface owner can prove that the use of the pore space for permanent saltwater disposal has resulted in "lost land value" or "lost use of and access to the surface owner's land" within the meaning of § 38-11.1-04.[16] While the court

---

[15] Pore space is not the only subsurface that may be utilized by the mineral developer. For example, the mineral developer might use the sand, gravel, scoria or clay underlying the surface, which ordinarily belongs to the surface owner unless they are the subject of a specific prior reservation or grant. See, e.g., George v. Veeder, 2012 ND 186, ¶ 10, 820 N.W.2d 731. And, if used by the mineral developer, the court is confident that the North Dakota Supreme Court would conclude that such use was compensable under ch. 38-11.1.

[16] In making this judgment, the court must follow North Dakota's law with respect to the construction of its statutes. Roubideaux v. North Dakota Dept. of Corrections and Rehabilitation, 570 F.3d 966, 972 (8th Cir. 2009) (a federal court looks to state law for the law governing the construction of state statutes). The state law on that subject has been succinctly summarized by the North Dakota Supreme Court in Locken v. Locken, 2011 ND 90, 797 N.W.2d 301, as follows:

> Our primary objective in interpreting a statute is to determine the legislature's intent, and we initially look to the language of the statute to determine intent. [Schmidt v. Gateway Cmty. Fellowship, 2010 ND 69, ¶ 14, 781 N.W.2d 200]. Words in a statute are given their plain, ordinary, and commonly understood meaning, unless they are defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1-02-02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1-02-07. The letter of a statute cannot be disregarded under the pretext of pursuing its spirit when the language of the statute is clear and unambiguous. N.D.C.C. § 1-02-05. "[I]f the language of a statute is ambiguous or of doubtful meaning or if adherence to the strict letter of the statute would lead to an absurd or ludicrous result, the court may resort to extrinsic aids to interpret the statute." Stutsman County v. State Historical Soc'y, 371 N.W.2d 321, 325 (N.D. 1985). " 'A statute is ambiguous if it is susceptible to different, rational meanings.'" Sauby v. City of Fargo, 2008 ND 60, ¶ 8, 747 N.W.2d 65 (quoting Simon v. Simon, 2006 ND 29, ¶ 12, 709 N.W.2d 4). Section 1-02-39, N.D.C.C., lists extrinsic aids for construing ambiguous statutes:
>
> > If a statute is ambiguous, the court, in determining the intention of the legislation,

(continued...)

is not persuaded by Denbury's arguments based on its parsing of the word "land" and believes the North Dakota Supreme Court would reach the same conclusion, the court recognizes that ch. 38-11.1 does not specifically mention pore space.  Also, it may very well be that the state legislature did not have pore space in mind when it passed the law.  Nevertheless, the North Dakota Supreme Court is likely to follow its clearly-established rule of giving effect to the plain and ordinary meaning of the statutory language in the context in which it is used and conclude, just as the Montana Supreme Court appears to have concluded, that (1) "surface owner's land" as used in ch. 38-11.1 includes all of the surface owner's rights and interests, and (2) this necessarily includes the right of the surface owner to control everything above and below the surface (including here the pore space), given that this right has long been the law in North Dakota and was not explicitly excluded by ch. 38-11.1.  See, e.g., Locken v. Locken, 2011 ND 90, ¶9, 797 N.W.2d 301; Estate of Christeson v. Gilstad, 2013 ND 50, ¶ 14, 829 N.W.2d 453 ("[T]his Court must presume the legislature meant what it said and said all it intended to say. . . .  Consequently, we will not correct an alleged legislative 'oversight' by rewriting unambiguous statutes to cover the situation at hand.") (internal quotation omitted); N.D.C.C. § 1-02-02.[17]  And with that, the North Dakota Supreme Court would likely say to Denbury

_____

[16](...continued)
       may consider among other matters:
           1. The object sought to be attained.
           2. The circumstances under which the statute was enacted.
           3. The legislative history.
           4. The common law or former statutory provisions, including laws upon
       the same or similar subjects.
           5. The consequences of a particular construction.
           6. The administrative construction of the statute.
           7. The preamble.
Id. at ¶ 9.

[17]  While the court left this question open in Fisher, Judge Hovland did state in a footnote in that case:
Chapter 38–11.1 addresses compensation for damage and disruption of the surface owner's land

(continued...)

and other mineral developers that any problems this creates are for the state legislature to fix and not the court. See, e.g., Doyle ex rel. Doyle v. Sprynczynatyk, 2001 ND 8, ¶ 14, 621 N.W.2d 353 ("We have said many times if changes are to be made in the statute, we leave that matter to the legislature, as it is for the legislature to determine policy, not for the courts.") (internal quotation omitted).[18]

---

[17](...continued)
occasioned by oil and gas exploration and development, but makes no mention of pore space. The North Dakota Supreme Court has not addressed whether Chapter 38–11.1 may be read to encompass compensation for use of pore space. The purpose of Chapter 38–11.1 is to "provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals." N.D.C.C. 38–11.1–02. Chapter 38–11.1 is to be interpreted in order to benefit surface owners. The express language of Section 38–11.1–04 requires compensation for all damage to the surface owner's land. "The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner ... for lost land value [and] lost use of and access to the *surface owner's land*." N.D.C.C. § 38–11.1–04 (emphasis added). Arguably, the pore space is a part of the surface owner's land. The North Dakota Legislature has irrevocably tied the pore space estate to the surface estate in Chapter 47–31. Thus, a compelling argument can be made that the language and purpose of Chapter 38–11.1 are broad enough to encompass compensation for use of the pore space.
49 F. Supp. 3d at 648 n.3.

[18] For example, the state legislature could amend ch.38-11.1 to exclude the mineral owner's use of deep-earth pore space from statutory compensation under the chapter. Another possibility might be for the state legislature to unitize the use of the deep-earth pore space similar to what the legislature has done for the use of pore space for the storage of $CO_2$ under N.D.C.C. ch. 38-22, which specifically includes a mechanism for providing compensation to nonconsenting landowners whose spore space is being occupied. The fact there are options for balancing the interests of surface owners and mineral developers, as well as insuring that deep-earth injection is not unduly impeded, supports the likelihood of the North Dakota Supreme Court applying the plain language of the statute and leaving it to the legislature to decide what adjustments, if any, are needed as a matter of public policy. Cf. Buchholz v. Burlington Resources Oil and Gas Co. LP, 2008 ND 173, 755 N.W.2d 914 (concluding that unitization did not relieve the unit operator from having to pay for the disposal of salt water as required by a pre-unit lease agreement given the plain language of North Dakota's unitization statutes).

Moreover, it does not appear the world will end by construing the relevant statutory language to encompass all of the surface owner's rights, including the right to control the pore space. Notably, this construction does not prohibit a mineral developer from permanently disposing of salt water by injection into the subsurface. In fact, the court has concluded that Denbury has the right to do so in this case for salt water generated from within the Unit. The only consequence is that a mineral developer (including Denbury in this case) may not be able to do it cost free *if* the surface owner can prove the right to compensable damage under ch. 38-11.1.

And, with respect to that possibility, a mineral developer is not without options. For example, a mineral developer can do just what Denbury did here, *i.e.*, proceed forward without reaching an agreement with the surface owner and then pay damages if the surface owner can prove that he or she has suffered a compensable loss. Also, a mineral developer could negotiate with the surface owner for an easement and, if the price is too high, negotiate with some other surface owner and then truck or pipe the salt water to a well located on that surface owner's property, rather than trucking or piping it to property of the surface owner with whom an agreement could not be reached. Still another

(continued...)

24

### 5. Denbury's argument that plaintiffs' ch. 38-11.1 claim is barred because plaintiffs failed to give timely notice of their damages

#### a. Disagreement over the construction of the notice requirement

Denbury contends that plaintiffs' ch. 38-11.1 claim is barred because they failed to give notice of their damages within two years of the first injection of salt water into the Mosser Well. Denbury cites to N.D.C.C. § 38-11.1-07, which, in its present form,[19] reads as follows:

> **§ 38-11.1-07. Notification of injury--Statute of limitations.**
> Any person, to receive compensation, under sections 38-11.1-08 and 38-11.1-09, shall notify the mineral developer of the damages sustained by the person within two years after the injury occurs or would become apparent to a reasonable person. Any claim for relief for compensation brought under this chapter must be commenced within the limitations period provided in section 28-01-16.

In this case, the first occurrence of any "injury" resulting from Denbury's use of the pore space would have been no earlier than the first injection of salt water on September 30, 2011. Denbury claims that § 38-11.1-07 must be read to require that plaintiffs were obligated to provide notice within two years of that date or on or before September 30, 2013.

Plaintiffs, on the other hand, contend that notice is timely if it is given within two years of when they reasonably should have become aware that damage was occurring even if that date is beyond two years from when the damage first occurred. In response, Denbury argues that this

---

[18](...continued)
option is for the mineral developer to truck or pipe the salt water to a commercial disposal site either for underground injection or possibly recycling and reclamation. There may also be other possibilities.

Consequently, even if the North Dakota Supreme Court would conclude that the statutory language is ambiguous - which is doubtful, the court is likely to reach the same conclusion by giving primary weight to the fact it is consistent with the expressed legislative intent in §§ 38-11.1-02 and 38-11.1-01(3) over any concerns about the consequences of the interpretation.

[19] The last sentence was added in 2013, apparently to make explicit what already was the law in that, even without the last sentence, the six-year limitations period in § 28-01-16 would have applied since it covers, among other things, statutory actions. N.D.C.C. § 28-01-16(2) ("An action upon a liability created by statute, other than a penalty or forfeiture when not otherwise expressly provided.").

interpretation reads out of the statute the words "after the injury occurs," and that if the state legislature had intended that notice need only be given within two years of when a reasonable person would have known of the injury, the statute would have simply stated that and not included "after the injury occurs." What Denbury leaves unsaid, however, is that the same argument can be made for plaintiffs' proffered construction, which is, if notice must be given within two years of when the injury occurred, that ignores the alternative of "would become apparent to a reasonable person" - at least under any sensible reading of the statute.

The North Dakota Supreme Court has stated that "or" normally should be interpreted as applying the disjunctive. State v. Silseth, 399 N.W.2d 868, 870 (N.D. 1987) ("In its ordinary sense, the term 'or' is a conjunction indicating an alternative between different things or actions."). And, applying the disjunctive here, means that, in order for a person to make a claim for compensation as authorized by the two sections referenced in § 38-11.1-07, notice must be given within two years of when the injury occurs or, in the alternative, within two years after a reasonable person would have become aware of the injury. Further, applying this construction to the statutory language does not render doubtful its meaning or lead to an "absurd" or "ludicrous" result. Rather, it simply expresses what likely was the state legislature's intent and the mere fact the statute could have been written more simply does not here suggest the contrary.[20]

_____

[20] While the court reaches the conclusion about the meaning of the notice language based on what is set forth above, the court notes that at least one legislator (Senator Hogue, an attorney from Minot) read the statute the same way when the legislature in 2013 added the language making it clear that the time period in which an action must be brought is that prescribed in § 28-01-16. During a Senate Judiciary Committee hearing, the following exchange is reported to have taken place:

> Senator Lyson asks if it is an underground break and you do not notice it do you get six years. Senator Hogue replies that in theory it could go longer. He said it is however long a reasonable person would have been able to discover that.

Minutes of Senate Judiciary Committee Hearing on H.B. 1350, 63d N.D. Legis. Sess (Mar. 1, 2013).

But, even if it could be concluded that the notice language is ambiguous, the North Dakota Supreme Court would likely in that instance adopt the construction that best fits the ameliorative purpose of the statute, which, as noted earlier, is providing maximum protection to surface owners. And here, that construction would be that notice is timely if given within two years of when a reasonable person would have become aware of the damages.

> **b.** **There are material questions of disputed fact with respect to whether plaintiffs' claims of notice were timely for all injections of salt water dating back to the first injection**

Turning then to the question of whether notice was timely given, plaintiffs claim that notice was first given in August 2013 during a conversation that Ralph Mosser had with a purported agent of Denbury who was seeking to obtain an easement for a pipeline. Mosser claims he advised the agent that before he was willing to address the pipeline, an agreement needed to be reached with respect to the disposal of salt water into the Mosser Well. If this notice was sufficient, then notice for all of the damage occurring as a result of the saltwater injection was timely since two years from the first injection of salt water would have been on or about September 30, 2013.

Denbury contends this conversation was insufficient because it was not notice of damage, but rather a conversation about whether Denbury would be willing to enter into a contract with plaintiffs for the disposal of salt water. The court concludes, however, that what has been proffered is sufficient to create a fact issue regarding notice of damage.[21] That is, a reasonable juror could conclude that Denbury understood from the tenor of the conversation and the demand for an agreement for saltwater disposal that plaintiffs were taking the position that Denbury did not have

---

[21] Denbury agrees the conversation took place, but that it was on September 10, 2013, and not the month prior.

the right to do what they were doing and this necessarily involved damage to plaintiffs' property interests.[22]

While this is sufficient to deny Denbury's motion for summary judgment based on the lack of notice, one of plaintiffs' attorneys wrote Denbury a letter dated October 17, 2013, claiming damage resulting from Denbury's use of the pore space that Denbury agrees would have been sufficient notice if timely. Notably, this was only 17 days beyond the two-year period from the first injection of salt water that Denbury claims plaintiffs had to give notice. To bridge the 17-day gap, if not more, one of the plaintiffs has submitted an affidavit claiming lack of awareness that salt water was being disposed of in the Mosser Well until sometime in 2013, given the remoteness of the Mosser Well and the fact that the traffic in the area was believed to have been generated by activity at other nearby wells.

Denbury contends this is insufficient to create a fact issue. In particular, Denbury argues that, even if the notice provisions are construed to permit notice within two years of when a reasonable person would have known of the damage, it does not make a difference in this case. Denbury contends this is because of the notice given by its predecessor Encore to one or more plaintiffs in March 2008 that a saltwater disposal permit was being applied for. Denbury argues this was sufficient to put plaintiffs on notice that the saltwater disposal would be taking place such that, if they were going to claim damage as a result of the saltwater disposal, they needed to be vigilant in terms of protecting their rights and should have known that Denbury was using the well for

---

[22] This is particularly true when considering the context of what was taking place. This was not a situation where Denbury's operation caused some damage to plaintiffs that Denbury may not have been aware of, such as damage to a water well. Here, Denbury knew that the salt water it was disposing of was occupying plaintiffs' subsurface. And, while Denbury appears to have been of the belief that it had right to dispose of the salt water without paying additional compensation to plaintiffs because there was no injury, the point is that a jury could conclude that they were put on notice that plaintiffs were claiming differently.

saltwater disposal when the first injection of salt water took place. According to Denbury, the last date plaintiffs had to give timely notice was two years from the first injection of salt water on September 30, 2011, regardless of how the statute is construed, so the October 17, 2013, letter would have been untimely.

The court disagrees. Plaintiffs have submitted enough to create a fact issue with respect to when a reasonable person would have become aware that damage was taking place. As for the March 2008 notice of the application to convert the Mosser Well for saltwater disposal, the court believes that a jury might very well give it little weight since the notice was only for an application for a permit, not the granting of it. Further, even if plaintiffs had followed up and learned the permit had been granted, nothing happened at the well during the year for which the permit was issued. And, while Encore timely applied for an extension, no notice was given of that application or the fact it was granted. Moreover, this happened not just once, but two more times, during the almost three and one half years in which no effort was made to convert the well. In other words, Denbury's argument that the notice given in March 2008 was adequate assumes plaintiffs should have been constantly checking the NDIC docket during this time period. In short, not only might a jury reasonably conclude the March 2008 notice lacked probative force, it is on the borderline of having any relevance at all given its remoteness in time and the lack of any follow-on notices.

### c. Plaintiffs' "continuing conduct/damage" argument

Finally, plaintiffs take the position that, even if the jury concludes notice was untimely with respect to the initial damage that occurred when salt water was first injected, the October 17, 2013 letter was timely notice for any damage that occurred beginning two years prior to the date of the letter. According to plaintiffs, this is because there has not been a single injury or one instance of

damage. Rather, according to plaintiffs, the injury is continuing with the repeated injection of salt water because more pore space is being occupied and the capacity of the already-occupied pore space to hold more is being diminished.

Denbury, on the other hand, contends the purported injury is the injection of salt water into the pore space generally and that the obligation to provide notice is triggered with the first occurrence of damage. Here, both arguments are plausible given the statutory language of § 38-11.1-07: "Any person, to receive compensation, under sections 38-11.1-08 and 38-11.1-09, shall notify the mineral developer of the damages sustained by the person within two years after the injury occurs or would become apparent to a reasonable person."

While plaintiffs argue that this question can be resolved based on the statutory language alone, they suggest the North Dakota Supreme Court would look to its case law with respect to continuing conduct or damage - specifically those cases addressing continuing trespasses or nuisances, since, arguably, these are the most analogous given the nature of the claimed injury, even though what is at issue is a statutory claim for damages that presumes the mineral developer has the right to inflict the damage. Plaintiffs argue that the policy underlying continuing trespass/nuisance cases of allowing recovery for continuing acts would be applied by the North Dakota courts here to permit the statutory notice under § 38-11.1-07 to be given at any time, so long as the conduct giving rise to the injury is continuing and creating additional damage, but with right to recover compensation being limited to the damages occurring after the point in time beginning two years prior to when the notice is given.

Denbury disagrees, contending that the analogy to the continuing trespass/nuisance cases is not a good one. But, even if it is, Denbury argues that any injury resulting from its use of the pore

space would be deemed "permanent" under the North Dakota cases that have rejected claims for continuing trespass on that ground.[23] Denbury cites in particular to the North Dakota Supreme Court's decision in Hager v. City of Devils Lake, 2009 ND 180, 773 N.W.2d 420 ("Hager"). In that case, the North Dakota Supreme Court addressed whether the plaintiffs could bring successive actions for periodic flooding created by a "permanent storm sewer system which ha[d] been in place for nearly thirty years[.]" Id. at ¶ 23. The court concluded plaintiffs could not, distinguishing earlier cases that permitted or discussed the fact that, in some situations, successive actions can be brought for a continuing trespass, including Peacock v. Sundre, Twp., 373 N.W.2d 877, 879 (N.D. 1985) ("Peacock") ("The Peacocks accurately describe the general rule that recurring trespasses give rise to repeated actions to recover for successive actions.") and Rynestad v. Clemetson, 133 N.W.2d 559

---

[23] While the courts in most jurisdictions look to whether the purported trespass or nuisance is permanent or temporary in deciding whether successive suits can be brought or only one suit, there is little uniformity in terms of how permanency is determined. In some jurisdictions, the focus is upon whether the damage or harm caused by the trespass or nuisance is continuing or spreading. Other jurisdictions reject that approach and focus exclusively upon the conduct of the party committing the trespass or causing the nuisance and whether new acts of trespass or nuisance are taking place, i.e., repeated acts of trespass or nuisance always give rise to successive claims. In some jurisdictions, neither of the foregoing are dispositive and the focus, instead, is upon whether the trespass or nuisance can reasonably be abated. Still other jurisdictions rely upon a combination of these and other factors to determine whether the trespass or nuisance is permanent or continuing. The net result is that the outcome for essentially the same fact pattern can be different depending upon what jurisdiction's law applies. See, e.g., Vander Salm v. Bailin & Assoc., Inc., No. 11-40180, 2014 WL 1117017, at **6-7 (D. Mass. Mar. 18, 2014) (applying Massachusetts law); Wilson Road Development Corp. v. Fronabarger Concreters, Inc., 971 F. Supp. 2d 896, 913-16 (E.D. Mo. 2013) (applying Missouri law); Litz v. Maryland Department of the Environment, 76 A.3d 1076 (Md. Ct. App. 2013); Burley v. Burlington Northern & Santa Fe Railway Co., 273 P.3d 825, 828-44 (Mont. 2012); McCoy v. Gustafson, 180 Cal. App. 4th 56, 84-90 (Cal. Ct. App. 6th Dist. 2009); Schneider National Carriers, Inc. v. Bates, 147 S.W.3d 264, 275-93 (Tex. 2004); Breiggar Properties, L.C. v. H.E. Davis & Sons, Inc., 52 P.3d 1133, 1135-37 (Utah 2002); Anderson v. State, 965 P.2d 783, 789-92 (Haw. Ct. App. 1998); see generally 51 Am. Jur. 2d Limitation of Actions §§ 138, 147 (database updated as of May 2015); Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, The Law of Torts §§ 57, 404 (2d ed. database updated as of June 2015). Finally, there is some authority for the proposition that, where it is unclear whether the continuing conduct is permanent or temporary, the plaintiff should be allowed to elect how it will be treated. See, e.g., Provident Mut. Life Ins. Co. of Philadelphia v. City of Atlanta, 864 F. Supp. 1274, 1289 (N.D. Ga. 1994) ("Left with equally viable and equally wanting options, the Court believes that the proper response is to employ the default position of allowing Plaintiff to chose how it wishes to construe Defendant's alleged nuisance. [citation omitted]. Accordingly, the Court finds that Plaintiff has alleged a cause of action for continuing nuisance and that because the alleged nuisance occurred within the four years preceding the date on which Plaintiff filed its suit, Defendant is not entitled to summary judgment on this claim."); Baker v. Burbank-Glendale-Pasadena Airport Authority, 705 P.2d 866, 870 (Cal. 1985).

(N.D. 1965) (permitting a successive action for injunctive relief ordering the closing of ditches that created repeated acts of flooding). The court stated in <u>Hager</u>:

[¶ 21] The Hagers contend that North Dakota law does not recognize the distinction between permanent and temporary injuries, and that <u>Rynestad</u> creates a bright-line rule that, no matter the nature of the cause of the diversion of water, each time water flows in an unnatural manner as a result of the actions of upstream landowners a new cause of action accrues and a new limitations period begins to run. The Hagers do not argue that the construction causing the discharge of storm water onto their land is not permanent, but claim the permanent nature of the structure is irrelevant under <u>Rynestad</u>. The Hagers assert that <u>Rynestad</u> applies to permanent obstructions because, in that case, "the Court ruled the statute of limitations starts over each time water flows through the improvements made by the defendants and onto the land of the plaintiff despite the fact the ditches and drains installed by the defendants were presumably permanent."

[¶ 22] The Hagers have misread <u>Rynestad</u> when they suggest the ditches and drains in that case were "presumably permanent." This Court never characterized the ditches as permanent, and in fact the Court expressly ordered that the ditches which had been constructed by neighboring landowners be filled, and that the ditches along the township roads be properly maintained, to allow water to follow its natural course of drainage. <u>Rynestad</u>, 133 N.W.2d at 566. When a plaintiff seeks injunctive relief and a writ of mandamus, and the court orders that the property be restored to its natural condition to allow the original, natural course of drainage, the improvements cannot be considered permanent. <u>See</u> 1 Dobbs, <u>supra</u>, § 5.11(2) ("[i]f the court has already compelled an abatement of the nuisance, it will be obvious that the nuisance is not a permanent one").

[¶ 23] In this case, the alleged dispersal of water upon the Hagers' property is caused by a permanent storm sewer system which has been in place for nearly thirty years and which was built at the Hagers' request. While it may be logical to allow recurring causes of action for temporary conditions which can be remedied or removed through injunctive relief, as in <u>Rynestad</u>, it would be wholly illogical to allow repeated causes of action when the instrumentality causing the flooding is a permanent structure which provides substantial, continuous benefits to the general public, as in this case. When the cause of the injury is a permanent structure and injunctive relief is not appropriate or practical, the injury gives rise to only one cause of action, not a series of actions. <u>See</u> 1 Dobbs, <u>supra</u>, § 5.11(1); 78 Am.Jur.2d <u>Waters</u> § 388 (2002). Furthermore, the Hagers' pleadings recognize the permanent nature of the alleged damage to their property, as evidenced by their allegation that the flooding has caused an actual physical taking of a part of the larger parcel. <u>See</u> <u>Peacock</u>, 372 N.W.2d at 879.

[¶ 24] We conclude that, when water is diverted onto property by construction or operation of a permanent structure, there is only one cause of action, successive suits may not be maintained, and the statute of limitations begins to run when harm first occurs. We therefore conclude that <u>Rynestad</u> does not apply in this case.

<u>Hager</u>, 2009 ND 180 at ¶¶ 21-24.

<u>Hager</u>, however, is distinguishable in several respects. For one thing, the trespasser in <u>Hager</u> built a sewer system and after that nature took its course. Here, the saltwater disposal well is not a permanent structure in the same sense since it can more readily be removed. Further, and more significantly, the mere existence of the saltwater disposal well does not create the invasion upon plaintiffs' subsurface; rather, it is the operation of the well, which can be stopped at any time. Also, <u>Hager</u> involved a case where the flooding, while intermittent and not always the same, was cabined in its scope by the maximum runoff that nature could produce. In this case, according to plaintiffs, the repeated injections of salt water are spreading its invasion into new pore space[24] and diminishing the available capacity of that already occupied.[25]

Denbury also argues that, notwithstanding the fact that the disposal of the salt water could be stopped at any time, plaintiffs have elected to treat the injury that they claim is occurring as permanent and cites to cases where the North Dakota Supreme Court has held or suggested that an election to treat the damages as permanent forecloses the right to bring successive actions for a continued trespass or nuisance. The problem with this is that it is not clear that plaintiffs have yet

---

[24] Plaintiffs would argue that the continued expansion into new pore space is conceptually no different than Denbury constructing a well pad and then five years later using more of the adjacent surface to construct additional holding tanks and arguing that any claim for recovery for the expansion of the well pad was barred by the failure to give notice earlier.

[25] The North Dakota Supreme Court's decision in <u>Peacock</u> also is not dispositive. All that the court concluded in that case was that a second action to recover for damages was barred because plaintiffs had sought and obtained judgment for future damages in an earlier action. <u>Peacock</u>, 372 N.W.2d at 879.

made an election.[26]  Further, even if they have, it is not clear whether that would foreclose the right to bring successive actions from that point forward or whether the election dates back to the time of first occurrence of injury, which may depend on what is claimed for past and future injury, how each is calculated, and whether any argument for treating possible future conduct or damages as permanent did not become viable until later.  See Restatement (Second) Torts § 930 comment (1)(b) (1979) (suggesting that, in some cases, any election to treat the damages as permanent would operate prospectively only); cf. Peacock, 372 N.W.2d at 879.  Denbury cites to Hager, where the North Dakota Supreme Court, after concluding that the trespass in that case was permanent, went on to state that the plaintiffs' pleadings "recognize[d] the permanent nature of the alleged damage to their property, as evidenced by their allegation that the flooding has caused an actual physical taking of a part of the larger parcel."  2009 ND 180, ¶ 23.  This, however, may be nothing more than an observation confirming what the court had already concluded with respect to permanency and not a holding that an otherwise temporary trespass is made permanent *ab initio* by a later election to treat future damages as permanent.

In summary, the North Dakota Supreme Court has not addressed the question of permanency in the context of continued discharges of a polluting substance on or within land belonging to another that could be stopped at any time and that may be causing additional damage, which arguably provides the closest analogy to what is taking place here - if any analogy to the continuing trespass or nuisance doctrine is relevant.[27]

---

[26]  Some of plaintiffs' requests for relief request a permanent award of damages and some requests would be characterized as seeking relief for what has occurred in the past.

[27]  Denbury in its briefing cites to the Eighth Circuit's discussion about "continuing tort" in Roemmich v. Eagle Eye Development, LLC, 526 F.3d 343 (8th Cir. 2008) as suggesting that the only time the doctrine would apply is when

(continued...)

At this point, the court will not decide whether plaintiffs' "continued conduct/new damages" argument for why their October 17, 2013, notice was timely for damage occurring after October 12, 2011, since the fact issues with respect to the timeliness of the plaintiffs' notice that the court has otherwise determined to exist are sufficient to resolve the pending motions. Further, the court believes it would be better to decide the issue with a more complete record that hopefully will address the actual mechanics of what takes place when the salt water is injected into the formation authorized by the NDIC.[28]

### 6. Denbury's argument that the ch. 38-11.1 claim fails because plaintiffs have failed to demonstrate they have suffered actual damages

Denbury argues that ch. 38-11.1 requires proof of actual damages and that plaintiffs have not suffered any, particularly since they were not using the pore space for any purpose when Denbury began using it. In addition to relying upon the statutory language, which Denbury suggests requires proof of actual damage, Denbury points to the Eighth Circuit's decision in Murphy v. Amoco Production Co., 729 F.2d 552 (8th Cir. 1984), where the court stated in a footnote: "We emphasize

---

[27](...continued)
no single incident in a chain of tortious activity can fairly be identified as the cause of the significant harm so that the time for commencing the action does not arise until the tortious activity ceases. Denbury asserts that this is not the situation here. How Roemmich helps Denbury, however, is not clear. As noted by the Eighth Circuit, the North Dakota Supreme Court has applied the "continuing tort" doctrine in some cases. In Beavers v. Walters, 537 N.W.2d 647 (N.D. 1995), it was the retention of royalties by a person who knew that the royalties belonged to someone else and in O'Fallon v. Pollard, 427 N.W.2d 809 (N.D.1988) it was plaintiff's continued wrongful imprisonment. In both of the cases, each day the royalties were retained or the plaintiff was imprisoned resulted in concrete, measurable, and significant harm - arguably as much, and probably more so, than the daily invasion of plaintiffs' pore space by the continued injection of salt water over an extended period of time.

The real problem for Denbury's argument, however, is that the courts frequently treat continuing trespass or nuisance cases differently - at least in terms of whether or not successive actions can be brought. See Vander Salm v. Bailin & Assoc., Inc., No. 11-40180, 2014 WL 1117017, at *6 (D. Mass. Mar. 18, 2014) (noting that Massachusetts generally does not recognize the doctrine of continuing tort but does apply the doctrines of continuing trespass and nuisance); see also cases cited in note 23, supra. And, from what the North Dakota Supreme Court has had to say about the subject in Rynestad and Peacock (cases that the Eighth Circuit did not address in Roemmich) that would appear to the case in North Dakota as well.

[28] The court also has the option of submitting any relevant fact issues to the jury relating to this argument and deciding the question afterwards should that become necessary.

that the statute in question neither requires a developer to pay for anything other than the *actual damage* to the surface estate which results from development, nor requires a developer to share any of the actual proceeds of mineral development with the surface owner." Id. at 555 n.3 (italics in original).

Plaintiffs disagree. They contend that the statement in Murphy was based upon an older version of ch. 38-11.1 that did not contain "lost use of and access to" as one of the listed items for which damages could be recovered, which was added to § 38-11.1-04 in 1983. Plaintiffs contend that, while lost agricultural production, lost land value, and lost value of improvements require a showing of actual damages under § 38-11.1-04, "lost use of and access to" is broader and injury can be inferred as it occurs without a showing of actual damages.

Unfortunately, not only are there no North Dakota cases addressing a statutory claim for damages for a mineral owner's use of pore space, the parties have been able to point to only one other case in the country that has addressed a similar claim, that being the previously referenced decision by the Montana Supreme Court in Burlington Resources, 2011 MT 199. In that case, plaintiff claimed he had suffered a loss by the mineral developer's use of the pore space underlying his property for the disposal of salt water even though he was not using it, and offered evidence of what other landowners were receiving for saltwater disposal as a matter of industry custom as proof of his damages. Id. at ¶¶ 5-6, 32. The Montana Supreme Court, while recognizing that a claim for "lost land value" under the Montana statute could encompass damages sustained by a surface owner for the use of the pore space, concluded that plaintiff's evidence was insufficient proof of any item of injury compensable under Montana's statute, including "lost land value." In relevant part, the court stated:

¶ 27 Lang argues first that SODDCA requires Burlington to pay a per barrel fee to dispose of wastewater into the pore space. SODDCA requires Burlington to pay Lang for "loss of agricultural production and income, lost land value, and lost value of improvements" caused by Burlington's oil and gas operations. Section 82-10-504(1)(a), MCA. The District Court determined that Lang had failed to provide evidence that Burlington's use of the pore space affected Lang's interest in the land value, agricultural production, or value to improvements, as set forth under SODDCA.

¶ 28 Lang conceded that use of the pore space in the Dakota and Swift Formations did not affect its agricultural production and income. Lang provided no evidence that injecting wastewater into the pore space lessened the value of the land. Lang admitted that it had not lost value in improvements to the land. Finally, Lang offered no evidence that the pore space underlying its land had been degraded, damaged, devalued, or otherwise consumed by Burlington's use of the pore space. The District Court correctly concluded that Lang had failed to offer evidence of separate compensable damages under the elements specifically enumerated in SODDCA.

¶ 29 Burlington hired George Luther to appraise damages to Lang's property. Luther has over 26 years of appraisal experience and has appraised over 1,000 properties. Luther had never valued, or heard of any other appraiser valuing, pore space. Luther testified that no demonstrable market exists for pore space. Luther opined that Burlington's development activities of the pipeline and pumping station in 2008 had caused $5,500 in SODDCA damages to the surface of Lang's property. Lang offered no separate expert appraisal of damages. Lang agreed that Luther's calculations constituted a fair estimate of lost land value under SODDCA.

¶ 30 Lang insisted, however, that § 82-10-501(2)(c), MCA, requires that a landowner be made whole for all impacts upon the surface estate. Section 82-10-501(2)(c), MCA, provides the purpose statement for SODDCA. It provides that "owners of the surface estate should be justly compensated for use of their property and interference with the use of their property due to oil and gas development." Section 82-10-501(2)(c), MCA. The District Court concluded that the more specific provision for damages at § 82-10-504(1)(a), MCA, controlled over the broad purpose statement in § 82-10-501, MCA.

¶ 31 We agree, in this instance, that Lang's broad "made whole" interpretation of § 82-10-501(2)(c), MCA, could render meaningless the more explicit provision of damages contained in § 82-10-504(1)(a), MCA. We recognize that the provision authorizing compensation for "lost land value" under § 82-10-504(1)(a), MCA, could encompass damage sustained by a surface estate owner for the use of pore space. Lang made no claim for "lost land value."

¶ 32 Lang instead claimed a right to separate compensation for Burlington's use of the pore space. Lang points to testimony from seven witnesses before the District Court who testified that other landowners have received a fee for wastewater disposal as a matter of industry custom. SODDCA sets forth no element of compensation to landowners for the use of pore space according to industry custom. SODDCA requires compensation only for "loss of agricultural production and income, lost land value, and lost value of improvements." Lang failed to offer evidence of losses to the surface estate compensable under SODDCA.

Burlington Resources, 2011 MT 199 at ¶¶ 27-32.

N.D.C.C. § 38-11.1-04 similarly allows a surface owner to recover for lost land value. And here, the North Dakota Supreme Court would likely conclude that plaintiffs can recover for lost land value resulting from Denbury's use of the pore space even though plaintiffs were not using it when Denbury commenced its use, as the Montana Supreme Court appears to have concluded Burlington Resources. In other words, one pathway for plaintiffs recovering for any lost potential for use of the pore space is evidence that the value of their tract has been diminished by Denbury's use of it.[29]

Plaintiffs correctly point out that another compensable item of injury under § 38-11.1-04 is "lost use of and access to" their property, which, as noted by Burlington Resources, was not a listed item of compensable injury under Montana's statute. However, the court need not decide now what

---

[29] In a somewhat analogous context, the North Dakota Supreme Court has held that property owners seeking to recover damages in eminent domain cases are not limited to damages based on the present use of the property, but that any recovery based on a different use is limited to that for which there is a reasonable probability the property could be put to in the near future. See, e.g., Frederickson v. Hjelle, 149 N.W.2d 733, 743-44 (N.D. 1967) (addressing the extent to which potential future use of property can considered in awarding just compensation in a condemnation action). Notably, the North Dakota pattern jury instruction addressing this subject reads, in relevant part, as follows:

> In determining fair market value, you should consider past uses of the property, and all other uses for which it is suitable or adaptable and needed or likely to be needed in the reasonably near future, as will in reasonable probability affect its market value while it is privately owned. However, the owner is not entitled to compensation based on remote, speculative, uncertain, or mere possible use.

NDJI-Civil C-75.05. In a case in this District involving a claim that the mineral developer's use of the surface of plaintiff's ranch for the drilling of a number of wells interfered with plaintiff's plans for converting the ranch to a commercial hunting/recreational development, the court allowed the jury to decide whether plaintiff should be awarded damages under § 38-11.1-04 based on its planned future use for the property and gave an instruction that incorporated the foregoing language. Deadwood Canyon Ranch LLP v. Fidelity Exploration and Production Company, No. 4:10-cv-00081, Doc. No. 144 (accessible through CM/ECF).

it might take to prove that Denbury's use of the pore space has resulted in lost use of or access to the pore space by plaintiffs or what evidence would be sufficient to prove damages if there has been such a loss. At this point, plaintiffs have not had an opportunity to fully develop their damage case and resolution of these issues would benefit from a more developed record. Also, since the possibility of being able to prove lost land value exists, this alone is sufficient to deny Denbury's present motion for summary judgment.

### III.     CONCLUSION AND ORDER

For the reasons set forth above, plaintiffs' motion for partial summary judgment (Docket Nos. 31 & 55) and defendants' motion for summary judgment (Docket No. 35) are **DENIED**.

Dated this 24th day of June, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court