| | | |
|---|---|---|
| Randall Mosser, Douglas Mosser,<br>Marilyn Koon, and Jayne Harkin, | )<br>) | |
| | ) | **REQUEST FOR ANSWERS** |
| Plaintiffs, | ) | **TO CERTIFIED QUESTIONS** |
| | ) | **AND ORDER FOR TRANSMITTAL** |
| vs. | ) | **TO THE NORTH DAKOTA SUPREME** |
| | ) | **COURT** |
| Denbury Resources, Inc. and | ) | |
| Denbury Onshore, LLC, | ) | Case No. 1:13-cv-148 |
| | ) | |
| Defendants. | ) | |

## I. CERTIFIED QUESTIONS

Pursuant to N.D. R. App. P. 47, the United States District Court for the District of North

Dakota respectfully requests that the North Dakota Supreme Court answer the following questions

that have arisen in this action between plaintiffs and defendants (collectively "Denbury"):

1.    In North Dakota, does the owner of the surface estate own the pore space deep below

the surface, absent some conveyance of the pore space to a third party and even when

the mineral estate has been severed from the surface estate?

2.    If the answer to the first certified question is yes, do the provisions of N.D.C.C. §

38-11.1-04 that require compensation be paid to a surface owner for "lost land value"

and "lost use of and access to" a surface owner's land extend to a mineral

developer's use of the subsurface pore space for the disposal of saltwater generated

as a result of drilling operations?

3.    If the answer to the second certified question is yes, is the ability to recover damages

under N.D.C.C. § 38-11.1-04 limited to when the surface owner is currently using

the pore space or when there is evidence that the surface owner is likely to make use of the pore space within the reasonably near future, either by personally using it or leasing it to another?

4.     Are damages under N.D.C.C. § 38-11.1-04 for a mineral developer's use of subsurface pore space for disposal of saltwater recoverable only if the surface owner can prove a diminution in the market value of the affected property?

5.     In order to recover damages for a mineral developer's use of subsurface pore space for the disposal of saltwater under N.D.C.C. § 38-11.1-04, must the surface owner prove some damage other than the mere occupancy or loss of access to the pore space, *e.g.,* an interference with the surface owner's actual use of the pore space or a concrete plan to do so in the reasonably near future or evidence of diminution in the market value of the property affected by the saltwater disposal?

6.     Can a surface owner recover damages under N.D.C.C. § 38-11.1-04 for a mineral developer's use of the surface owner's pore space for the disposal of saltwater when the only evidence upon which to calculate damages is: (1) proof of what is being paid to other surface owners for the use of their pore space for the disposal of saltwater on a per barrel basis (assuming the third party transactions being relied upon are "arms length" and fairly comparable); and (2) evidence of the number of barrels of injected saltwater that, more likely than not, is occupying the surface owner's pore space?

7.     If a surface owner can recover damages under N.D.C.C. § 38-11.1-04 for a mineral developer's use of the surface owner's subsurface pore space based on an amount

per barrel for barrels of saltwater injected into the subsurface, can the surface owner in the same action recover additional damages based on an estimate of how many more barrels of saltwater could be injected into the pore space if the surface owner is able to prove, more likely than not: (1) the mineral developer's disposal of saltwater has foreclosed the ability of the surface owner to make use of the remaining capacity in the formation into which the saltwater is being injected; and (2) the remaining capacity of the formation into which the saltwater is being injected?

## II.  STATEMENT OF FACTS

Unless otherwise indicated, the following facts are uncontested. Additional background information is set forth in Mosser v. Denbury Resources, Inc., 112 F. Supp. 3d 906 (D.N.D. 2015) ("Mosser").

### A.  Plaintiffs' interests as burdened by the Mosser Lease

Plaintiffs are the owners of the surface estate only in the following described quarter section of land located in Billings County, North Dakota:

Township 141 North, Range 101 West
Section 26:  NW¼

When plaintiffs acquired their interest, it was already burdened by an oil and gas lease dated November 28, 1977 (the "Mosser Lease") granted by plaintiffs' predecessors-in-title, who, at the time, owned both the surface and the minerals in the following property included in the Lease:

Township 141 North, Range 101 West
Section 17: All
Section 20: S½N½, SE¼
Section 21: S½
Section 22: S½
Section 25: All
Section 26: All

3

Section 27: All

The Mosser Lease remains in effect because of continuous production of oil and gas from wells located on the leased acreage.

**B.     Unitization of the lessee's rights in the Mosser Lease with other interests**

By an order dated May 16, 2003, the North Dakota Industrial Commission ("NDIC") authorized the creation of the T.R.-Madison Unit ("Unit") by approving a plan for unitization for the following lands in Billings County:

> Township 141 North, Range 101 West
> Section 10: All
> Section 11: All
> Section 12: All
> Section 13: W½, NW¼NE¼
> Section 14: All
> Section 15: All
> Section 16: All
> Section 21: All
> Section 22: All
> Section 23: All
> Section 24: NW¼NW¼
> Section 25: W½
> Section 26: All
> Section 27: All

Denbury is the current operator of the Unit.

**C.     The Mosser Well and its conversion for disposal of saltwater**

Prior to the creation of the Unit, the Mosser Well was spud as an oil and gas well on what is now plaintiffs' surface acreage in the NW¼ of Section 26. It produced oil and gas from January 1979 through June 2006.

An application to convert the Mosser Well into an injection well for the disposal of saltwater was submitted to the NDIC on March 12, 2008. The NDIC approved the request on April 11, 2008,

4

but the conversion had to be completed within one year or the approval would expire. Following several requests for extension, Denbury completed the conversion on September 26, 2011, which was within a year following the last approved extension. The permit that was issued authorizes Denbury to dispose of production water from other wells into the Dakota Sandstone formation at a depth of 5340' to 5496'. According to the requirements in place at the time, notice of the request for approval of the permit to dispose of saltwater had to be given to surface owners owning land within a 1/4 mile of the disposal well.

The first saltwater injection took place on September 30, 2011. Since then, Denbury has used the Mosser Well to dispose of saltwater into the subsurface. Denbury has acknowledged that 1,495,261 barrels of saltwater had been disposed of through the Mosser Well through April 2014. Plaintiffs' expert, Hal Demuth, states that this had increased to over 3.2 million barrels by March of 2016, according to information that Denbury has reported to the NDIC.

## III.   THE FEDERAL ACTION

Plaintiffs' complaint in this case alleged three claims for Denbury's use and occupancy of the subsurface of their property for the disposal of saltwater:  trespass; nuisance; and a statutory claim for damages pursuant N.D.C.C. § 38-11.1-04. The only claim that remains, however, is the claim pursuant to § 38-11.1-04. Plaintiffs agreed to forgo their claims for trespass and nuisance in exchange for Denbury withdrawing their defense of plaintiffs having failed to give proper notice of their § 38-11.1-04 claim.

On June 24, 2015, the court denied an initial set of cross-motions for summary judgment. In so doing, the court decided the first two certified questions in the affirmative. Also, the court addressed the third certified question to a limited extent as discussed more fully later. Mosser, 112

F. Supp. 2d at 918-23 & 931-33 (D.N.D. 2015) ("Mosser"). Since final judgment has not been entered in this case, these ruling can be revisited in the event the North Dakota Supreme Court disagrees.

There is now pending a second motion for summary judgment in which Denbury makes several arguments for why this case must be dismissed. The court ruled on one of the arguments (which is not the subject of any of the certified questions), but deferred consideration of the remainder pending the North Dakota Supreme Court's response to the certified questions.

## IV.     DISCUSSION OF THE CERTIFIED QUESTIONS

### A.     Introduction

The first two certified questions go to the issue of whether the statutory obligation of a mineral developers to pay compensation to surface owners under § 38-11.1-04 extends to a mineral developer's use of the pore space deep below the surface, in this case for the disposal of saltwater. There are two reasons why the court has decided to certify the first two questions notwithstanding the fact it has already addressed them. First, it would be unfair to ask the North Dakota Supreme Court to answer the remaining questions without having afforded it the opportunity to consider the threshold issues presented by the first two questions. Second (and to be frank), there is the concern the North Dakota Supreme Court might decline to address the remaining questions in the absence of it having ruled on the first two on the grounds that, from its perspective, any rulings on the remaining questions might be viewed as advisory.

If the answers to the first two questions are in the affirmative, the answers to the remaining questions, in large part, are dependent upon how the following sentence of N.D.C.C. § 38-11.1-04 is to be interpreted and applied:

> The mineral developer shall pay the surface owner a sum of money equal to amount of damages sustained by the surface owner . . . , if any, for lost land value, lost of use of and access to the surface owner's land . . . .

Of particular relevance are the words: "damages sustained," "if any," "lost land value," and "lost use of and access to."

In this case, the only evidence of damage that plaintiffs will be offering is evidence that the saltwater being disposed of by Denbury is occupying their pore space and what others are paying to surface owners for subsurface disposal of saltwater.[1] Denbury claims this is not enough to recover under § 38-11.1-04 if it applies. Denbury contends that there must be some evidence that plaintiffs were either using the pore space or, perhaps, had some concrete plans to do so in the near future. Further, even if actual or intended use is not required, Denbury contends that plaintiffs must at the very least proffer some evidence that their property has diminished in value. According to Denbury, in the absence of plaintiffs being able to prove any of these things (*e.g.*, interference with an actual or intended use or, perhaps, loss of land value), plaintiffs have failed to prove that they have sustained damage within the meaning of the statute and their claim pursuant to § 38-11.1-04 must be dismissed.

Questions three through six go to whether plaintiffs can recover damages on a per barrel basis for the saltwater that plaintiffs can demonstrate is occupying their pore space based only on evidence of what others are paying surface owners for the disposal of saltwater or whether § 38-11.1-04 requires something more. If those questions are answered in manner that allows plaintiffs' claim to go forward, then question seven goes to whether plaintiffs can also recover for pore space that Denbury has not yet utilized if plaintiffs can convince the factfinder that Denbury's disposal of

---

[1] The time for plaintiffs making their pretrial disclosures with respect to experts and damages has passed; hence, they are locked into the evidence that they are now proffering.

saltwater has foreclosed their future use of that pore space.

**B.** **First certified question:** *In North Dakota, does the owner of the surface estate own the pore space deep below the surface, absent some conveyance of the pore space to a third party and even when the mineral estate has been severed from the surface estate?*

As already noted, this court has answered the first certified question in the affirmative. Mosser, 112 F. Supp. 2d at 919. In fact, Denbury made no effort to argue differently given N.D.C.C. §§ 47-01-12 & 47-31-03. Again, the principal reason for this question is that it is a predicate for what follows and it does not appear that the North Dakota Supreme Court has previously addressed it.

**C.** **Second certified question:** *If the answer to the first certified question is yes, do the provisions of N.D.C.C. § 38-11.1-04 that require compensation be paid to a surface owner for "lost land value" and "lost use of and access to" a surface owner's land extend to a mineral developer's use of the subsurface pore space for the disposal of saltwater generated as a result of drilling operations?*

The question presented here is whether the statutory entitlement to damages under N.D.C.C. § 38-11.1-04 extends to a mineral developer's use or occupation of the subsurface of the surface estate, which, in this case, is for disposal of "saltwater."[2] Denbury contends it does not, arguing that ch. 38-11.1 was intended only to address the mineral developer's use of the surface of the surface estate and not the pore space lying deep beneath the surface.

Denbury's argument starts with the principal that, under the common law rule of dominance of the mineral estate, mineral developers have the right to make reasonable use of the surface estate. From that, Denbury contends that, while ch. 38-11.1 was enacted to ameliorate some of the

---

[2] For purposes of the questions posed here, "saltwater" includes: (1) naturally occurring subsurface water that is produced during recovery of oil and gas that is high in salinity; (2) water from other sources that is injected into a producing well to stimulate recovery (along with, perhaps, added chemicals and other substances), some of which may return to the surface; and (3) any other waste water generated during oil and gas recovery operations that the NDIC permits to be disposed under the permit for the Mosser Well.

harshness resulting from the fact that mineral developers did not have to pay for their reasonable use of the surface at common law rule, the North Dakota Legislature intended only to require that compensation be paid by mineral developers for surface uses and then only if the surface owner can prove some actual, demonstrable damage.   According to Denbury, it was not the intent to further burden mineral developers by requiring that compensation be paid for reasonable use of the subsurface, particularly for the storage of saltwater, most of which came from deep within the earth in the first place.  In support, Denbury points to the repeated use of the word "surface" in ch. 39-11.1, as well as to the statements of legislative intent in § 38-11.1-01 that place particular emphasis on the need to protect agriculture, which, essentially, is a surface use.

Plaintiffs, on the other hand, argue that the plain language of ch. 38-11.1 extends the right to compensation for any use of the surface owner's lands, which they contend includes subsurface pore space.  Plaintiffs further argue that, if there is any doubt, the legislature has instructed in §§ 38-11.1-01 and 38-11.1-02 that the remedial provisions of ch. 38-11.1 must be expansively construed in the surface owner's favor.

The reasons why this court predicted the North Dakota Supreme Court would likely answer the second certified question in the affirmative are set forth in Mosser, 112 F. Supp. 3d at 918-923. As indicated by the court's discussion, there does not appear to be any prior decisions of the North Dakota Supreme Court that have decided it.

Prior to this case, the only reported decision that addressed the ability of a surface owner to recover for a mineral developer's use of the subsurface pore space for disposal of saltwater under a statute enacted to provide compensation for uses of the surface estate by mineral developers was the Montana Supreme Court's decision in Burlington Resources Oil & Gas, Co., L.P. v. Lang and

Sons, Inc., 2011 MT 199, 259 P.3d 766 (Mont. 2011). In that case, the Montana Supreme Court concluded (albeit in *dicta*) that a mineral developer's use of the surface owner's subsurface pore space would be compensable under Montana's surface owner protection law (which is very similar to North Dakota's) if the surface owner could produce evidence of lost land value. Id. at 932 ("We recognize that the provision authorizing compensation for "lost land value" under § 82-10-504(1)(a), MCA, could encompass damage sustained by a surface estate owner for the use of pore space."); see Mosser, 112 F. Supp. 3d at 931-33 (discussing Burlington Resources).

Subsequently, Chief Judge Hovland of this court reached the same conclusion as the undersigned with respect to the potential for a claim under § 38-11.1-04 for a mineral developer's use of the pore space for disposal of saltwater in Fisher v. Continental Resources Inc., Civ. No. 1:13-cv-097 ("Fisher"). In an unpublished order dated October 8, 2015, Judge Hovland stated:

> Chapter 38-11.1 does not define land. Continental invites the Court to adopt the definition of land as set forth in Title 47 which provides "[l]and is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance." N.D.C.C. § 47-01-04. Continental focuses on the phrase "solid material of the earth" and notes pore space is defined as "a cavity or void, whether natural or artificially created, in a subsurface sedimentary stratum" in N.D.C.C. 47-31-02 in support of its argument to exclude the pore space from the meaning of the word "land" in Section 38-11.1-04.
>
> This argument regarding the "solid material of the earth" was recently rejected in an opinion the Court finds persuasive. See Mosser v. Denbury Res., Inc., No. 1:13-CV-148, 2015 WL 3892013, at *10 (D.N.D. June 24, 2015). In Mosser, the court held that the phrase "solid material of the earth" is "clearly a relative description in that all soil and gravel, as well as many rock formations, have some interstitial space, and there is no reason to believe that the reference to soil, rock, or other substance in Section 47-01-04 was meant to exclude the space encapsulated within that material." Id. In Mosser, the court further explained there is no indication the North Dakota Legislature meant to apply the definition of "land" found in Title 47 to Chapter 38-11.1, and the term land is subject to different meanings in different contexts. Id. For instance, one legal dictionary defines land as "1. An immovable and indestructible three-dimensional area consisting of a portion of the earth's surface, the space above and below the surface, and everything growing on or permanently affixed to it. 2. An estate or interest in real property." Black's Law Dictionary 881 (7th ed. 1999). It is this common three-dimensional concept of an estate in land that the Court finds best fits the context of the term land as used in Section 38-11.1-04.
>
> An opinion from the Montana Supreme Court offers guidance as well. In Burlington

Res. Oil & Gas Co., LP v. Lang and Sons Inc., 259 P.3d 766 (Mont. 2001), the court was asked to decide whether Montana's Surface Owner Damage and Disruption Compensation Act ("SODDCA") required a mineral developer to pay compensation to the surface owner for use of the subsurface pore space for salt water disposal operations. While ultimately deciding the surface owner had failed to offer adequate proof of his damages and had not made a claim for "lost land value," the court acknowledged that the SODDCA provision authorizing compensation for "lost land value" "could encompass damage sustained by a surface estate owner for use of pore space." Id. at 771.

The express language of Section 38-11.1-04 requires compensation for the "lost use of and access to the surface owner's land." N.D.C.C. § 38-11.1-04 (emphasis added). North Dakota law is clear that "the owner of land in fee has the right to the surface and to everything permanently situated beneath or above it." N.D.C.C. § 47-01-12. Land is considered real property. N.D.C.C. § 47-01-03. Thus, in the absence of a severance of the mineral estate, or the severance of the pore space estate made prior to April 9, 2009, the effective date of Chapter 47-31, a fee simple owner of land owns not only the surface, but all which lies beneath the land, including the minerals and the pore space. Pore space, which is no longer severable from the surface estate in North Dakota, is an estate in land much like the mineral estate. The North Dakota Legislature has irrevocably tied the pore space estate to the surface estate in Chapter 47-31. Chapter 47-31 makes clear that title to the pore space estate is vested in the owner of the surface estate, and severance of the pore space from the surface estate is prohibited. N.D.C.C. §§ 47-31-05 and 47-31-03. It would be illogical to conclude that the pore space is not a component of the land as that term is commonly understood and as it is used in Section 38-11.1-04. This finding is in keeping with the purpose of Chapter 38-11.1 which is to "provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals" and the requirement that Section 38-11.1-04 "must be interpreted to benefit surface owners." N.D.C.C. § 38-11.1-02.

Accordingly, the Court finds as a matter of law that the term "land" as used in Section 38-11.1-04 encompasses the pore space. The Court further finds that the language and purpose of Chapter 38-11.1 are broad enough to encompass compensation for use of the surface owner's pore space as a component of the "surface owner's land" as provided in Section 38-11.1-04.

Id. at Doc. No. 82, pp. 7-9.[3]

---

[3] A number of the remaining certified questions in this case were also at issue in Fisher. However, unlike in this case, Continental Resources had not yet begun disposing of the saltwater, and, for this reason, Judge Hovland declined to address them, stating:

Continental also contends in its motion for summary judgment that even if Chapter 38-11.1 was intended to compensate surface owners for damage to their subsurface interests caused by oil and gas development, those surface owners must still prove the subsurface interest at issue was actually damaged before compensation can be awarded. Further, Continental contends the Fishers have not offered any admissible evidence to support their claim for loss of use of and access to the pore space. The Fishers contend no use is without impact and no property interest is without value. In addition, the Fishers maintain they have offered admissible evidence of their damages and offer the opinions of two expert witnesses to support their assertion. See Docket Nos. 47-1 and 66-1. Continental disputes the admissibility of these expert opinions and has filed motions to strike and/or exclude the experts and their opinions. See Docket Nos. 56 and 65.

**D.**     **Third certified question:** *If the answer to the second certified question is yes, is the ability to recover damages under N.D.C.C. § 38-11.1-04 limited to when the surface owner is currently using the pore space or when there is evidence that the surface owner is likely to make use of the pore space within the reasonably near future, either by personally using it or leasing it to another?*

Denbury contends that the reasons it expressed for why a § 38-11.1-04 claim for a mineral developer's use of the subsurface pore space should not be allowed at the very least require that the relevant statutory language be construed so as to allow recovery only if the surface owner can prove actual damage. Denbury contends this can only occur within the meaning of the statute if the surface owner has been using the pore space or, perhaps, there is evidence that the surface owner

---

There is no question that the Fishers must prove damages. There is no dispute that Continental has yet to actually inject any salt water into the Lonesome Dove 42-17 SWD well which was permitted and drilled in 2013. Continental has been authorized to inject 38,813,976 barrels of salt water into the well, but it has yet to inject even one barrel. Damage to the pore space is clearly dependant on the number of barrels of salt water injected into the pore space. In his affidavit, Plaintiffs' expert Hal Demuth states "[t]o a degree proportional with injection volume, impacts to pore space occur as soon as water is injected into the formation." See Docket No. 47-1, ¶ 7. Plaintiff's expert Chris Orth opines as to the "potential value" of the pore space. See Docket No. 66-1, p. 5. The opinions of the Fishers' experts are made in the abstract because the well has never been put into use.
`       It remains to be seen whether Continental will actually utilize the well, when the well will be utilized, and how many barrels of salt water will be injected into the well. The record does not establish that Continental intends to inject 38,813,976 permitted barrels into the Lonesome Dove 42-17 SWD well, nor does it establish when Continental will begin using the well. There cannot be an award of damages for an injury which has yet to occur and is uncertain to result in the future. See N.D.C.C. § 32-03-03 ("Damages may be awarded . . . for detriment . . . certain to result in the future."); see also N.D.C.C. § 32-03-09.1 (one measure of damages for injury to property is the "difference between the market value of the property immediately before and immediately after the injury"). Those cases which have addressed the issue of damage to pore space have done so after the injection of waste water has occurred. See Burlington Res., 259 P.3d at 769, 771 (finding the plaintiff failed to prove damages resulting from the injection of two million barrels of waste water into the pore space); cf. Cassinos v. Union Oil Co. of Calif., 18 Cal. Rptr. 2d 574, 584 (Cal. Ct. App. 1993) (affirming damage award made on a per barrel basis for the injection of more than two million barrels of offsite wastewater). In this case, the record clearly reveals there has not yet been any "lost use of and access to" the pore space, and any damage award at this time would be pure speculation. Koch Hydrocarbon Co., a Div. of Koch Indus. Inc. v. MDU Res. Grp., Inc., 988 F.2d 1529, 1545-46 (8th Cir. 1993) (denying damages that were both uncertain to occur and wholly speculative in amount). The claim for damages for "lost use and access to" the pore space is premature, and dismissal of the claim without prejudice is warranted.
Id. at pp. 9-11. The Continental case subsequently settled.

12

is likely do so in the reasonably near future.[4]  Also, as discussed in the next section, Denbury contends there must be some concrete evidence of actual damage other than the mere use of the pore space, at least so long as that occupancy is within the mineral developer's rights.  Otherwise, according to Denbury, no damages have been "sustained" within the meaning of § 38-11.1-04.

Notably, when the Montana Supreme Court suggested that a surface owner may be able to recover if "lost land value" could be proved, it did not address the question of whether a surface owner would also have to prove actual or imminent use of the pore space in order to recover.  In a somewhat different context of a claim for damages for trespass brought by a surface owner for the alleged invasion of wastewater that had been injected on neighboring property and has allegedly migrated into the complaining surface owner's subsurface, several courts have either held or suggested that something more than mere occupancy of the pore space is required to recover on a trespass claim, *e.g.*, physical damage or interference with an existing or foreseeable use.  See Chance v. BP Chemicals, Inc., 670 N.E.2d 985, 993 (Ohio 1996) ("[T]he trial court was correct in requiring appellants to prove some physical damages or interference with use proximately caused by the deepwells as part of their trespass claim in the circumstances of this case, thus placing on appellants the burden of establishing that the injectate interfered with the reasonable and foreseeable use of their properties."); Raymond v. Union Texas Petroleum Corp., 697 F. Supp. 270, 274-75 (E.D. La. 1988); West Edmond Salt Water Disposal Ass'n v. Rosecrans, 226 P.2d 965 (Okla. 1950), but see

---

[4]  The phrasing "the surface owner is *likely* to make use of the pore space within the *reasonably near future*" is based on the use of similar language in the somewhat different context of what potential uses can be considered in awarding compensation in eminent domain cases and that has been used by this court in allowing a jury to decide whether a surface owner should be awarded damages under § 38-11.1-04 based on a planned use of the property as opposed to its present use.  See Mosser, 112 F. Supp. 3d at 933 n.29 (discussing the issue).  In making shorthand reference to this limitation, the term "imminent" will also be used, keeping in mind that, qualitatively, there might be a slight difference. If the North Dakota Supreme Court concludes that some limitation is appropriate but disagrees with the language used in the question, the court is invited to rephrase the question.

Snyder Ranches, Inc. v. Oil Conservation Comm. of State of N.M., 798 P.2d 587, 590 (N.M. 1990) (concluding that the fact the mineral developer had a disposal permit for the saltwater did not immunize it from a common law claim for trespass without stating whether some actual damage apart from trespass resulting from the occupancy would be required).[5]

Plaintiffs contend, on the other hand, that they do not have to prove they were using the pore space or even that such use was imminent. They appear to make two arguments for why that is the case. The first focuses upon the language "lost use of and access to." Plaintiffs argue they have sustained damage within the plain meaning of § 38-11.1-04 by Denbury's injection of saltwater into the pore space of their surface estate because their use of and access to the pore space has been foreclosed all or in part by Denbury's use. They also contend there is nothing in the statutory language that requires proof of actual or imminent use if they can prove lost land value resulting from Denbury's injection of the saltwater into their pore space.

The court will have to address the third certified question in ruling on Denbury's second motion for summary judgment given the fact that plaintiffs were not using the pore space at the time Denbury commenced using it and the dearth of evidence of any imminent use on their part.[6] Further,

---

[5]  These cases illustrate another concern of mineral developers if "lost use of and access to" is construed to permit recovery of damages without any evidence of prior or imminent use or some other damage beyond mere occupancy of the pore space is the potential liability under § 38-11.1-04 to adjoining surface owners whose pore space may also be occupied if the injected saltwater migrates into their pore space or diminishes the ability to use their pore space because of displacement of other water by the injected saltwater. However, to the extent that a particular construction of § 38-11.1-04 might create unknown or difficult issues of liability, mineral developers do have the option of seeking a legislative fix. For example, one possibility might be for the legislature to develop a scheme whereby the NDIC would determine the likely zone of influence of any disposal well and, in the absence of the mineral developer coming to agreement with the affected surface owners, the NDIC would be authorized to "force pool" the subsurface likely to be affected and provide a mechanism for the surface owners sharing the compensation that would be paid for its use.

[6]  In this case, the court concluded in denying Denbury's first motion for summary judgment that the lack of actual use by plaintiffs of the pore space at the time Denbury commenced its use would not foreclose recovery if plaintiffs could prove loss of land value. The court did not address whether proof of imminent use was required because that point did not have to ruled on to deny the pending motion. Mosser, 112 F. Supp. 3d at 933. Since then, a more

14

even if there is some doubt about that point, the court would have to decide whether evidence of actual use or use in the reasonably near future is required for plaintiffs to be able to recover in instructing the jury. The parties have not cited to, not is the court aware of, any North Dakota Supreme Court case that has addressed the third certified question.

E.    **Fourth certified question:** *Are damages under N.D.C.C. § 38-11.1-04 for a mineral developer's use of subsurface pore space for disposal of saltwater recoverable only if the surface owner can prove a diminution in the market value of the affected property?*

Payment to a surface owner for disposal of saltwater on a per barrel basis by a mineral developer appears to be a common practice. See, e.g., Raaum Estates v. Murex Petroleum Corp., No. 4:14-cv-024, 2015 WL 5692151, at 5 (D.N.D. Sept. 28, 2015) (State of North Dakota charging $.10 per barrel for disposal of saltwater through a saltwater disposal well on state lands); Major Drilling America, Inc. v. Redemption Energy, LLC, No. 4:13–cv–048, 2013 WL 3716172, at 1 (D.N.D. July 12, 2013) ($.08 per barrel); Bucholz v. Burlington Northern Resources Oil and Gas, LP,, 755 N.W.2d 914 (N.D. 2008) ($.05 per barrel); Colburn v. Parker and Parsley Dev. Co., 842 P,2d 321, 329 (Kan. Ct. App. 1992) ($.015 per barrel).[7] In fact, in this case, Denbury is paying one or more of plaintiffs $.09 per barrel for disposal of saltwater in another disposal well that is located

---

developed record has been created and Denbury has submitted in support of its second motion for summary judgment deposition testimony from Randall Mosser which suggests that plaintiffs do not have, and never have had, any concrete plans for use of the pore space either by developing it themselves or leasing it to another party. Also, the court did not address in its earlier order what might be required to prove "lost use of or access to" the pore space.

[7] Denbury also introduced into the record a copy of a saltwater disposal agreement that was entered into between Whiting Oil & Gas Corporation and the State of North Dakota in June of 2013, located in a different township from the Mosser well. The agreement authorized Whiting to install, operate, and maintain a salt water disposal facility in the NW¼ of Section 16, T140N, R100W on 2.63 acres of land and granted easements for saltwater pipelines and an access road. The agreement recites that $14,185 dollars was paid as consideration for the agreement. In addition, Whiting agreed to pay an annual payment of $1500 for loss of agricultural production until the saltwater disposal well was plugged and abandoned and $.10 per barrel of saltwater injected or $500 per month, whichever is greater. Mosser, No. 1:13-cv-00148, Doc. No. 71-10.

within a mile of the Mosser Well.[8]

Simply because payment for disposal of saltwater on a per barrel basis may be a common practice does not necessarily mean it is a proper measure of damages as a matter of law. In other contexts, North Dakota law focuses upon market value as being the appropriate measure of damages involving real property when the adverse occupancy or other damage to real property is relatively permanent.

For example, in the eminent domain context, the appropriate measure of damages is the market value of the property taken. E.g., Hultberg v. Hjelle, 286 N.W.2d 448, 452 (N.D. 1979). And, in cases of partial takings that are more than temporary, recovery is determined by looking to whether there has been any diminution in value of the affected property, most often by using a "before-and-after" valuation analysis that compares the market value of the land prior to its taking to the market value after the taking to determine the diminution in value, if any.[9] See, e.g.,

_____

[8] Randall Mosser has offered his "landowner's opinion" that payment of $.15 to $.19 per barrel would be appropriate compensation for Denbury's use of their subsurface relying, in part, upon what he and other family members are being paid for the disposal of saltwater in well located in the SW¼ of Section, T141N, R101 West, which is within a mile of the Mosser Well. Id. at Doc. No. 94-2, pp. 95-103 (Deposition testimony of Richard Mosser). The record contains a copy of the saltwater disposal agreement for that well, which was entered into in September 1992 between the predecessors-in-interest of both plaintiffs and Denbury and which remains in effect. Id. at Doc. Nos. 104; 104-1; & 101-1. Under the agreement, the mineral developer agreed to pay an initial sum of $10,000 and then every month the greater of $.05 per barrel of saltwater disposed of or $500. In addition, the mineral developer agreed to pay $10 per rod for any pipelines that would be installed. Finally, the agreement also provided that it could be renewed for successive five year periods and that, for each five year renewal period, the lease required payment of an additional amount reflecting the escalation of the initial $10,000 in accordance with a formula set forth in the agreement as well as escalation of the per barrel and minimum monthly payment amounts. The current monthly payment under the agreement, as escalated, is $.09 per barrel or $900, whichever is greater. Id. at Doc. Nos. 94-2, p. 4; 101-1.

Plaintiffs have also offered through an expert evidence that commercial operators of saltwater disposal wells are being paid in range of $0.45 to $1.10 per barrel for the disposal of saltwater with, in the opinion of that expert, $0.78 per barrel being a reasonable number. Mosser, No. 1:13-cv-00148, Doc. No. 94, p.13. Even assuming the expert is qualified to give that testimony and putting aside the lack of specificity of his opinions, this evidence is of dubious relevancy and may simply confuse the jury given that these amounts would appear to include the commercial operator's costs to dispose of the saltwater as well as profit and do not reflect that portion which may being paid to the surface owner, if anything, on per barrel basis or otherwise.

[9] The most commonly used method of determining market value in making the before-and-after valuation is to consider comparable sales of other property. However, that is not the only method that may be accepted. "Appraisers

16

Dutchuck v. Bd. of Cty. Comm'rs., Billings Cty, 429 N.W.2d 21, 23 (N.D. 1988); Northern States Power Co. v. Effertz, 94 N.W.2d 288, 293-94. There is no right to recover separately for the loss of use of the property if that loss is reflected in the award of market value or diminution of the market value of the property. See, e.g., Hultberg, 286 N.W.2d at 453-57; Donaldson v. City of Bismarck, 3 N.W.2d 808 (N.D. 1942). However, when the taking is only temporary, some measure of damage other than diminution in value (such as the rental value of the property during the time of the temporary deprivation) may be more appropriate. See Rippley v. City of Lincoln, 330 N.W.2d 505, 509-11 (N.D. 1983); see generally 26 Am. Jur. 2d Eminent Domain § 235 (last updated Nov. 2016).

More to the point is N.D.C.C. § 32-03-09.1, which sets forth the measure of damages for cases of injury to property not arising out of contract and reads as follows:

> **§ 32-03-09.1. Measure of damages for injury to property not arising from contract.** The measure of damages for injury to property caused by the breach of an obligation not arising from contract, *except when otherwise expressly provided by law*, is presumed to be the reasonable cost of repairs necessary to restore the property to the condition it was in immediately before the injury was inflicted and the reasonable value of the loss of use pending restoration of the property, unless restoration of the property within a reasonable period of time is impossible or impracticable, in which case the measure of damages is presumed to be the difference between the market value of the property immediately before and immediately after the injury and the reasonable value of the loss of use pending replacement of the property. Restoration of the property shall be deemed impracticable when the reasonable cost of necessary repairs and the reasonable value of the loss of use pending restoration is greater than the amount by which the market value of the property has been diminished because of the injury and the reasonable value of the loss of use pending replacement.

(italics added). In applying § 32-03-09.1, the North Dakota Supreme Court has distinguished

---

generally use three approaches to get at fair market value: (1) analysis of comparable sales or market data; (2) analysis of the cost of replacement less depreciation; and (3) an income or economic analysis." Feist v. Feist, 2015 ND 98, ¶ 13, 862 N.W.2d 817 (quoting American Crystal Sugar Co. v. Traill Cnty. Bd. of Comm'rs, 2006 ND 118, ¶ 13, 714 N.W.2d 851); see also United States v. 3,698.63 Acres of Land, 416 F.2d 65, 67 (8th Cir. 1969) (stating that, while evidence of comparable sales is most often a better determiner of market value, federal courts may also consider evidence of reproduction costs and capitalization of net income, or a combination of these approaches).

between recovery for damages to property generally and damages for temporary loss of use and has held that both may be recoverable in an appropriate situation. <u>Lang v. Wonnenberg</u>, 455 N.W.2d 832 (N.D. 1990) (relying in party on <u>Restatement (Second) of Torts</u> § 929 (1979)); <u>see</u> <u>also</u> 22 Am. Jur. 2d <u>Damages</u> §§ 273 & 276 (updated September 2016). For damages to property that are more than temporary, § 32-03-09.1 presumes that the measure of damages is the cost of restoration and the reasonable value of loss of use pending restoration unless restoration is not feasible or possible, in which case the section appears to not only limit the damage to the diminution in value of the property but also requires that this be determined by comparing the market value of the property prior to the damage and to the market value of the property after the damage.

In this case, Denbury argues in its second motion for summary judgment that, even if § 38-11.1-04 does not require proof of actual or imminent use on the part of the plaintiffs, it at the very least requires that plaintiffs prove that they have otherwise sustained some actual, concrete damage in the form of diminution in market value of the affected property. In addition, Denbury contends that this must be done by using a before-and-after valuation analysis.

Denbury's argument is at least a plausible one. One possibility is that § 32-03-09.1 applies and requires proof of diminution of value since, arguably, a claim under § 38-11.1-04 is not one arising out of contract and restoration of pore space is "impossible" given Denbury's right to use the pore space. Also, plaintiffs' expert has conceded in his report that restoration is not practical.

Another possibility, if § 32-03-09.1 does not apply, is that § 38-11.1-04's use of the words "lost land value" contemplate proof of diminution in value of the land in order to recover damages for deprivations of use of the land that are more than temporary since that is what generally is required in other settings. As for § 38-11.1-04's use of "lost use of and access to," one possibility

is that this language was included only to insure that temporary deprivations of property (for which an appropriate measure of damages could be something other than diminution in value of the property, *e.g.*, lost income or rental value) would be compensated but that proof of diminution of the value of the property would be required for more permanent deprivations. Still another possibility, given the use of the conjunctive "and" between "lost use of" and "access to" is that the addition of these words was intended only to make clear that there could be recovery for lost use of any portion of the surface owner's surface that was cut off by a mineral developer's drilling operations, even if not otherwise directly effected, but was not intended to allow recovery absent some demonstrable evidence of loss of land value.

Finally, as relevant here, § 38-11.1-04 provides compensation for *damages sustained* when the surface owner experiences either *lost* land value or has *lost* use of or access to the property, rather than simply stating that the surface owner is entitled to compensation for a mineral owner's use or occupation of the property. This particular choice of words may also reflect an intent to require some evidence of actual, demonstrable damage (*e.g.,* an actual inference with an existing or planned use of the pore space by the surface owner or a demonstrated loss of land value) to be able to recover compensation for uses that are within the dominant rights of the mineral developer and for which no compensation was required at common law.

In <u>Burlington Resources</u>, the surface owner contended he was entitled to a per barrel fee for the disposal of saltwater and offered evidence from a number of landowners that they were being paid such a fee. The Montana Supreme Court denied recovery, however, on the grounds that the surface owner had failed to prove "loss of agricultural production and income," "lost land value," or "lost value of improvements," which were the compensable items under Montana's surface owner

protection law. Unlike North Dakota's law, Montana's statute did not provide recovery for "lost use of or access to" a surface owner's lands. 2011 MT 199, at ¶¶ 27-32.

Plaintiffs appear to make two arguments for why proof of diminution in value is not required - at least as determined by a traditional before-and-after valuation analysis. The first focuses upon the right to recover compensation for "lost land value." Plaintiffs' argument appears to be: (1) their property has suffered a decline in value, although difficult to measure using traditional before-and-after appraisal methods, particularly given that Denbury is paying for subsurface disposal of saltwater within a mile, which they suggest is a strong inference that plaintiffs tract has suffered some decline in value; (2) they should not be deprived of compensation simply because of the difficulty in proving loss of land value using a before-and after valuation analysis; and (3) the evidence of what others are willing to pay for use of pore space for disposal of saltwater on a per barrel basis is a reasonable proxy for providing compensation for lost land value in this situation. While not entirely clear, it appears the Montana Supreme Court in Burlington Resources rejected what amounted to the same argument. 2011 MT 199, at ¶¶ 27-32; see Mosser, 112 F. Supp. 3d at 931-33.[10]

Plaintiffs second argument focuses upon the statutory language "lost use of and access to" as well as the provisions that instruct that ch. 38-11.1 should be interpreted expansively in favor the surface owner. Plaintiffs argue that "lost use of and access to" expressly provides a second avenue for recovery that can be proved in ways other than diminution in value if that is viewed as being

---

[10] Plaintiffs, however, disagree and read the Montana Supreme Court's decision as concluding only that the plaintiff in that case failed to prove damage to their pore space and that, in this case, plaintiffs have tendered proof of damage through the report of their expert, Hal Demuth.

required to prove lost land value.[11] Also, § 38-11.1-04's specific delineation of separate items of recoverable damage arguably takes it out of the purview of § 32-03-09.1.

Plaintiff's arguments finds some support in what this court (Chief Judge Hovland) stated, albeit in a different context, in <u>Kartch v. EOG Resources, Inc.</u>, 845 F. Supp. 2d 995 (D.N.D. 2012):

> EOG contends that the damages available to the Kartches under N.D.C.C. § 38–11.1–04 are capped by the fair market value of the land directly affected by the well site. EOG claims that its offer of $8,000 exceeds the fair market value of the directly affected land. EOG also argues that damages awarded in an action under N.D.C.C. § 38–11.1–04 can only be paid in a one single lump sum payment, and the surface owner can only elect annual payments when the parties negotiate an agreement as to damages. The Kartches argue that damages under N.D.C.C. § 38–11.1–04 are not capped by the fair market value of the land; it is up to the fact finder to determine what land is directly affected by EOG's activities as well as the amount of damages; and they can elect annual damage payments.
> &ast; &ast; &ast; &ast;
> The North Dakota Supreme Court has never addressed the proper scope of damages under N.D.C.C. § 38–11.1–04. This statutory provision is poorly drafted and is, for all practical purposes, an invitation to further litigation. EOG argues that the Court should apply North Dakota law regarding the doctrine of waste and find that damages are capped at the fair market value of the surface estate. <u>See</u> <u>Meyer v. Hansen</u>, 373 N.W.2d 392, 397 (N.D.1985) ( "[D]epending on the facts of each case, either diminution in value or cost of repair is the appropriate measure of damages for waste"). The Court sees no reason to apply the doctrine of waste when the statutory language is clear. "[L]ost land value" is only one of the categories of damages contemplated by N.D.C.C. § 38–11.1–04. A surface owner can also collect for "loss of agricultural production and income . . . lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations." N.D.C.C. § 38–11.1–04 (2005). If the North Dakota Legislative Assembly had sought to cap the compensable damages under N.D.C.C. § 38–11.1–04, it could have easily done so. The Court finds, as a matter of law, that compensable damages under N.D.C.C. § 38–11.1–04 are not necessarily capped by the fair market value of the surface estate.

<u>Id.</u> at 1007-08.

Also, for cases involving the loss of use of property, some courts have held, albeit under different circumstances, that evidence of what others are willing to pay for comparable losses of use may be used as a basis for recovery. <u>See</u>, <u>e.g.</u>, <u>Southwestern Bell Tel. Co. v. Hamil</u>, 116 S.W.3d 798 (Tex. Ct. App. 2003) ("The usual measure of damages for loss of use of injured property is the

---

[11] Denbury contends that plaintiffs have not made a separate claim under this statutory language or, if they did, they abandoned it in their second round of summary judgment briefing. The court disagrees.

reasonable cost of renting a replacement, although the owner need not actually rent a substitute or show any amounts actually expended during the period of loss in order to recover. [citations omitted]. Where property is not rentable, the owner may resort to proving the actual worth of use."); Cassinos v. Union Oil Co., 14 Cal. App. 4th 1770, 1784-90 (Cal. Ct. App. 2nd Dist. 1993) (upheld an award of damages based on the amounts paid to others for commercial disposal of saltwater on a per barrel basis because no other measure of damages was appropriate, but the award in that case was for a wrongful disposal of saltwater that caused damage to an oil bearing formation).

Finally, as practical matter, what others are willing to pay to a surface owner for comparable disposal of saltwater may be the only damage evidence that may be available to a surface owner for the use of the subsuface given the difficulty in proving any diminution in value to the surface estate using a traditional before-and-after analysis. Cf., e.g., Livinggood v. Balsdon, 2006 ND 11, ¶ 8, 709 N.W.2d 723. ("[W]here damage obviously has been suffered, but there is no definite evidence available for an exact determination of the amount of damage resulting from a breach of contract, the best evidence which the circumstances will permit is all the law requires."); Hopkins v. McBane, 427 N.W.2d 85, 93 (N.D.1988) ( "Difficulty in measuring damages is a burden that should be borne by tortfeasors rather than their victims.").

The court is not aware of any North Dakota Supreme Court decision that has decided the fourth certified question and it is one that the court will have to address in ruling on Denbury's second motion for summary judgment.

**F.**      **Fifth Certified Question:** *In order to recover damages for a mineral developer's use of subsurface pore space for the disposal of saltwater under N.D.C.C. § 38-11.1-04, must the surface owner prove some damage other than the mere occupancy or loss of access to the pore space, e.g., an interference with the surface owner's actual use of the pore space or a concrete plan to do so in the reasonably near future or evidence of diminution in the market value of the property affected by the saltwater disposal?*

As already discussed, Denbury contends that, if plaintiffs are entitled to recover at all for the use of the pore space under § 38-11.1-04, they must prove interference with an actual or imminent use of the pore space <u>and</u> some diminution in value of the affected property. However, an argument can be made that § 38-11.1-04 would require only one or the other if surface owners must prove some damage other than the fact their pore space is being occupied. The fifth certified question goes to the issue of whether proof of some damage other than mere occupancy or denial of access to the pore space is required in order to recover damages under § 38-11.1-04. There does not appear to a North Dakota Supreme Court decision that provides an answer.

**G.**      **Sixth Certified Question:** *Can a surface owner recover damages under N.D.C.C. § 38-11.1-04 for a mineral developer's use of the surface owner's pore space for the disposal of saltwater when the only evidence upon which to calculate damages is: (1) proof of what is being paid to other surface owners for the use of their pore space for the disposal of saltwater on a per barrel basis (assuming the third party transactions being relied upon are "arms length" and fairly comparable); and (2) evidence of the number of barrels of injected saltwater that, more likely than not, is occupying the surface owner's pore space?*

In this case, it appears that the bottom end of the range of what plaintiffs are seeking in terms of a recovery on a per barrel basis is $.15 per barrel. For the number of barrels that likely have been disposed of as of March 2016, this would amount to a recovery approaching $500,000. This may very well be more than what plaintiffs' entire quarter section was worth prior to Denbury commencing injection of the saltwater, much less what might be any diminution in value to the

property resulting from Denbury's use of the pore space.[12]  Further, by the time this case goes to trial, it may well be that the total amount of saltwater that has been injected through the Mosser Well will have substantially increased.  For example, if the total amount of disposed saltwater at that point is five million barrels and the factfinder concludes that each barrel must be paid for, the recovery at $.15 per barrel would be $750,000.

The sixth certified question attempts to get to the issue of whether, aside from what may be the answers to the foregoing questions, it is possible to recover damages under § 38-11.1-04 based only on evidence of what others are paying to surface owners for the disposal of saltwater on a per barrel basis together with evidence of the amount of barrels that likely occupying the surface owner's pore space.  That is, whether a recovery on this basis is sufficiently tethered to what the state legislature contemplated in terms of the scope of recoverable damages under § 38-11.1-04, including in particular what was meant by the use of the words "damages sustained."[13]  The court is not aware of any North Dakota Supreme Court that has addressed this question.

### H.    Seventh Certified Question:  *If a surface owner can recover damages under N.D.C.C. § 38-11.1-4 for a mineral developer's use of the surface owner's subsurface pore space based on an amount  per barrel for barrels of saltwater*

---

[12]   In fact, the same may be true if the jury was to award only the $.09 per barrel that Denbury is currently paying to one or more of plaintiffs for disposal of saltwater in a nearby well.

[13]   A somewhat analogous issue over which there is considerable debate is whether evidence of what others are paying for easements, particularly when it is on a per rod (or per running foot) basis, should be allowed in cases when land is being condemned for pipelines and electric transmission lines.  The concern expressed in those cases that do no permit awards based on such evidence is that it is insufficiently related to market value.  Compare, e.g. Enbridge G&P (East Texas) L.P. v. Samford, 470 S.W.3d 848, 859-62 (Tex. Ct. App. 2015) (evidence of what others are paying on a per rod basis not admissible in the absence of any attempt to determine the diminution in the value of the property using a traditional before-and-after valuation analysis) with Water Authority of Dickson County v. Hooper, No. M2009-01548-COA-R3-CV, 2010 WL 1712968 (Tenn. Ct. App. 2009) (permitting consideration of what third parties were paying on a running foot basis for comparable easements); see Barlow Ranch, Limited Partnership v. Greencore Pipeline Co., LLC, 301 P.3d 75 (Wyo. 2013) (discussing the competing positions and allowing evidence of what others are paying on per rod basis based on a statute allowing for the use of this type of evidence in condemnation cases); see generally Derrick Braaten, This Land is Not for Sale, 42 Mitchell Hamline L. Rev. 1034 (2016) (discussing the competing positions).

*injected into the subsurface, can the surface owner in the same action recover additional damages based on an estimate of how many more barrels of saltwater could be injected into the pore space if the surface owner is able to prove, more likely than not: (1) that the mineral developer's disposal of saltwater has foreclosed the ability of the surface owner to make use of the remaining capacity in the formation into which the saltwater is being injected, and (2) the remaining capacity of the formation into which the saltwater is being injected?*

Plaintiffs' expert estimates that, when Denbury commenced its disposal of saltwater, there was 143,555,097 cubic feet of pore space capable of holding 23,963,508 barrels of saltwater in that portion of the Dakota Sandstone formation underling plaintiffs' quarter section. According to plaintiffs' expert, the more than 3.2 million barrels of saltwater that has been disposed of by Denbury as of March 2016 occupies approximately 14 percent of the total available pore space. (Doc. No. 102-1).

The court anticipates that plaintiffs will offer evidence that Denbury's disposal of saltwater has effectively foreclosed their ability to use or otherwise access the remaining pore space in the Dakota Sandstone formation. This may include what they contend is the unlikelihood that the NDIC would permit another disposal well in the same quarter section. If the court determines that plaintiffs' evidence in this regard is sufficient to create an issue for the jury and the jury finds the evidence to be persuasive, the question here is whether plaintiffs can obtain a recovery for their lost use of and access to the remaining pore space. At $.15 per barrel, this potentially could result in a recovery in excess of $3.5 million for both the pore space that is being occupied at the time of trial and the remaining pore space.[14]

The court is not aware of any North Dakota Supreme Court case that has decided the seventh certified question. In this case, the court will likely have to address it by the time it instructs in the

---

[14] Plaintiffs may feel compelled to seek recovery for this loss now given the uncertainty as to whether they can bring successive actions for further disposal of saltwater by Denbury.

jury as to the scope of damages that are recoverable, if not before.

## V.    **CERTIFICATION OF THE QUESTIONS**

In this case, both parties have objected to the court certifying any questions to the North Dakota Supreme Court, arguing, in part, that ch. 38-11.1 and other North Dakota law so clearly supports their respective positions that certification is unnecessary. While the parties have each made good arguments, they both cannot be right. If anything, the parties' arguments have served to reinforce the court's belief that the North Dakota Supreme Court should be given the opportunity to decide the certified questions given the difficult issues of statutory interpretation, the lack of guidance from the North Dakota Supreme Court, the public importance of the issues, the monetary amounts that could be at stake, and the likelihood of this court having to confront the same issues in other cases.[15]

The first two certified question are clearly determinative of whether plaintiffs have any statutory claim for compensation pursuant to N.D.C.C. § 38-11.1-04 for Denbury's use of the pore space underlying their quarter section. The same is likely true for the remaining questions. In particular, questions three through six will have to be addressed in some fashion in ruling on Denbury's second motion for summary judgment as well as when instructing the jury on what the governing law is. Question seven will also likely need to be resolved at least by the time the court instructs the jury with respect to the scope of the recoverable damages if not by an earlier motion in limine. In any event, the "may be determinative" requirement for certification from federal courts under N.D. R. App. P. 47(a)(1) is easily satisfied for all of the certified questions. See <u>Bornsen v.</u>

---

[15]  Given the fact that many of the disputes involving the application of ch. 38-11.1 involve out-of-state parties, it is no coincidence that virtually all of the reported decisions construing the chapter to date have been decided by this court and the Eighth Circuit.

Patrograde, LLC, 2011 ND 183, ¶¶ 6-8, 804 N.W.2d 55 (discussing the standard for certification of questions by a federal district court).

The court is not forwarding the briefing in this case because new briefs addressing the certified questions would be more helpful. However, the court is instructing the Clerk to forward certain pieces of the record - not because the court expects the North Dakota Supreme Court to resolve any disputed issues of fact - but because some of it might provide insight with respect to the complexity of the issues and the kind of evidence that is available. In addition, the court will provide whatever other docket information that might be desired upon request.

Finally, the court invites the North Dakota Supreme Court to reformulate any of the questions as it may deem appropriate in addressing the issues raised by the questions. See Mau v. North Dakota Ins. Reserve Fund, 2000 ND 97, ¶ 15, 610 N.W.2d 761 (the North Dakota Supreme Court making the same offer in certifying a question of law to another state's court).

## VI.   ORDER

The clerk of court shall transmit to the North Dakota Supreme Court this order and request for answers to certified questions along with the following:

1.    A copy of the court's docket.

2.    The application to the NDIC for disposal of the saltwater. (Doc. No. 6-5).

3.    The NDIC's Permit for Fluid Injection. (Doc. No. 56-2).

4.    Affidavit of Hal Demuth and attached report and publication excerpt. (Doc. Nos. 102, 102-1, and 102-2).

5.    Affidavit of Kathleen Nesbet (Doc. No. 95).

6.    Agreement for Salt Water Disposal between Meta Mosser and Presidio (Doc. No.

104-1).

**IT IS SO ORDERED.**

Dated this 18th day of November, 2016.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court